RAWLINGS MANUFACTURING CO. *v.* RED RUN GOLF CLUB.

1. MASTER AND SERVANT—SERVICES—CORPORATIONS—SPECIAL CONTRACTS—LIABILITY OF MASTER.

Where the board of directors of defendant golf club, recognizing that it was impossible to sell any more of the club's bonds to its members on the old basis, agreed with the secretary of the club to issue $50,000 worth of bonds on a more attractive business basis and pay him 5 per cent. commission in addition to his regular salary for selling them, defendant could not repudiate its obligation to pay the commission, after the secretary had sold the bonds, on the ground that it was already part of his duties as secretary to sell bonds; said special contract being within the power of the board to make.

2. SAME—FRAUD—FIDUCIARY RELATIONS—WITHHOLDING INFORMATION.

If the secretary, in making said special contract with the board of directors, withheld any information from them which it was his duty as secretary to disclose to them, or if it was obtained by unfair dealing or misrepresentation, said contract was voidable at the option of the board.

3. SAME—BROKERS—COMMISSIONS—TIME—ACCEPTANCE—WAIVER.

If the secretary procured a purchaser for the bonds and defendant received the money knowing that he was carrying on his efforts beyond the two weeks given him in which to make said sale, defendant may not repudiate its obligation to pay the commission on the ground that the sale was not made within the time stipulated.

4. SAME—BROKERS—PROCURING CAUSE—WAIVER.

As to whether the secretary was the procuring cause of the sale, and as to whether he waived his right to the commission agreed upon, *held*, under the evidence, questions for the jury.

5. SAME—BURDEN OF PROOF—WAIVER.

The burden of proof on the question of waiver rested on defendant.

6. NEW TRIAL—WEIGHT OF EVIDENCE—MISCARRIAGE OF JUSTICE.

Where the questions raised involved disputed issues of fact which were fairly submitted to the jury, and it cannot be said that the verdict in favor of plaintiff is so against the overwhelming weight of the evidence as to result in a miscarriage of justice, the case will not be reversed.

Error to Wayne; Wiest (Howard), J., presiding. Submitted April 26, 1922. (Docket No. 52.) Decided October 2, 1922.

Assumpsit by the Rawlings Manufacturing Company against the Red Run Golf Club for commissions on the sale of certain bonds. Judgment for plaintiff. Defendant brings error. Affirmed.

*William Henry Gallagher, Arthur J. Lacy* and *Samuel D. Frankel,* for appellant.

*Welsh, Bebout & Kahn,* for appellee.

STEERE, J. As assignee of one Richard Jackson, Jr., plaintiff recovered a verdict and judgment of $2,944.75 in the circuit court of Wayne county. Upon the trial the court at close of the testimony took a tentative verdict of the jury under the so-called Empson act with concluding instructions that if they found for plaintiff their verdict should be $2,500 with interest at 5 per cent. from April 22, 1916, and if for defendant, no cause of action. Following the verdict defendant moved for a judgment *non obstante* of no cause of action which was denied, and thereafter for a new trial which was denied and reasons therefor filed. Defendant's assignments of error relied upon and argued are refusal of the court to enter judgment *non obstante* for defendant and to grant a new trial.

At the time this cause of action arose plaintiff's assignee, Richard Jackson, Jr., was secretary of defendant. This claim upon which judgment was had

is for special services claimed to have been rendered by him under the following resolution adopted by defendant's board of governors, or directors, on January 5, 1916:

"*Whereas*, it having become imperative that some plan be adopted by which to raise sufficient funds to meet the obligations of the club, and

"*Whereas*, the further sale of bonds to members of the club seems improbable, and

"*Whereas*, there being $50,000 of bonds remaining of the $80,000 authorized and unsold, and

"*Whereas*, Mr. Richard Jackson, Jr., reports that he has assurances which will enable him to place said bonds at their par value if certain conditions obtain, now, therefore, it is

"*Resolved:* That the board of governors of the Red Run Golf Club hereby engage Mr. Richard Jackson, Jr., to secure purchasers for said $50,000 bonds and do hereby authorize and empower him to complete all necessary arrangements for the sale and delivery of said bonds.

"It being understood that the conditions under which Mr. Jackson is to act and which govern the sale of said bonds are as follows:

"The $50,000 bonds to be First Mortgage Class 'A' bonds bearing interest at the rate of six per cent. per annum payable semi-annually on January 1st and July 1st.

"That the bonds already subscribed and paid for to be 1st Mortgage Class 'B' bonds bearing interest at the rate of six per cent. per annum payable semi-annually on January 1st and July 1st.    *    *    *

"That the compensation of Mr. Richard Jackson, Jr., for selling said $50,000 bonds be 5%, such compensation to be due and payable when the full amount of $50,000 for the sale of said bonds be deposited to the credit of the club in the Security Trust Company.

"That the limit of time given Mr. Jackson to sell said bonds is two weeks from January 6, 1916."

The Red Run Golf Club was organized and incorporated in April, 1914. Jackson was one of its first members and active in its organization. In that

connection a separate entity called the Red Run Realty Company purchased for club grounds and partly paid for a suitable tract of 105 acres located near Detroit which it sold to defendant under a land contract.

Defendant's income having proved wholly inadequate to meet its expenses and the deferred payments on its land contract, a bond issue of $80,000 was authorized in April, 1915, but it was unable to dispose of more than $27,000 worth of these bonds under the original project for floating the loan, although a committee was appointed for that purpose and the subject taken up at every meeting that year, and subscriptions of members solicited. None of the $27,000 worth subscribed for was issued but receipts were given for payments made by subscribers, some of whom paid only 10% down on their subscriptions.

The financial condition of the club became critical and various expedients were discussed for floating the loan to meet pressing obligations and delinquent payments on its real estate. To that end the plan of bonding was modified to make the remaining portion of the authorized issue a first lien on its property, and otherwise more attractive by provisions in the resolution quoted from which it is unnecessary to dwell on.

As secretary of the club Jackson at first received for his services 10% commission on moneys taken in which was later changed to $200 per month. He testified that he was not satisfied with his compensation and told them as soon as "they could clean up the Realty Company," in which he was interested, he wanted to get out, that he had devoted his entire time to the club and said of his services:

"My duties as secretary of the club were as greens keeper; I also had to do everything around the club that was supposed to belong to other people to do. In fact, I did all the work that was to be done around

there.    It was partly my duty as secretary of the club to sell bonds."

Of his efforts to sell bonds Jackson testified that he was active in soliciting members to subscribe under their first project to float the $80,000 issue, and sold most of the $27,000 subscribed for, but the time came when they could dispose of no more.    Mr. Walter E. Flanders, apparently a man of ample means, was during that time a member of the club, but not an officer nor active in its affairs.    Jackson had, as he stated, secured his subscription for $1,000 worth of the bonds as a club member, but he had refused to be interested in it as a business matter or subscribe more under existing conditions.

The issue of bonds as originally proposed was manifestly unattractive as a business proposition. This newly-organized golf club had bought on a land contract 105 acres of land near Detroit from the so-called Red Run Realty Company composed of three members who had bought and but partially paid for it.    Without title to the land or other apparent resources even adequate to meet the running expenses of the club and no provision for a mortgage on what of value it may have had to secure the bonds, steps were taken and an effort made to issue and sell them.

When the directors met on January 5, 1916, the situation was discussed at length, the board being in session all day.    Jackson gave the club assurances that if the matter of bonding was readjusted and put in legal shape so the unsold bonds were made a first lien on its property he could secure a purchaser of the remaining $50,000 worth of bonds, for which service he wanted a commission if successful.    The matter of his compensation met with some opposition, but when the resolution quoted from so providing was introduced by a member of the board named Porter it was adopted.    Jackson testified that he made this

proposal after the board refused to accept the terms imposed by the Security Trust Company in a proposition he submitted.

On January 18, 1916, a meeting of the board was held at which a resolution was passed calling a special meeting of stockholders for February 2, 1916, to pass upon and legalize the bonding as proposed. Jackson testified he then reported to the board that he had sold to Mr. Flanders $50,000 worth of bonds, provided they were made a first mortgage series "A" with first lien over series "B" and all the then officers of the club would resign and let a new board be elected.

The action of the board was ratified by the stockholders at the meeting of February 2d, a resolution covering the proposition being offered by a Mr. Heft who was Flanders' secretary. Flanders took the bonds and when the prerequisite proceedings had been approved by his attorney the proceeds were deposited with the Security Trust Company and the realty company paid off, title to the land was transferred and a trust deed given to secure the bond issue, followed by the old officers of the club resigning and election of a new board. That Jackson devoted himself to that object and was actively connected with the various steps leading up to the successful consummation of the project is fairly shown.

It was and is defendant's contention that the promised compensation to Jackson was for past services in the line of his duties as secretary, that he was not the inducing cause of the sale of the $50,000 of bonds, that he knew before January 5, 1916, that Flanders would take them if offered upon a satisfactory business basis which he had outlined and concealed that information from his fellow members of the board, that he waived any commission that he otherwise might have claimed, and the sale was not accomplished within the two weeks limit of time

stipulated in the resolution. The trial court was of opinion those contentions involved issues of fact under the conflicting testimony and submitted the case to the jury in a full and fair charge with instructions as to the facts for their determination and applicable principles of law to guide them in their deliberations.

It is urged that recovery is precluded by Jackson's own testimony that one of his duties as secretary was to sell bonds. That testimony was given in connection with his account of efforts to sell the issue as first attempted, which proved unsuccessful and was abandoned. The resolution of the board providing a commission recognized that plan as a failure, that further sales to members was improbable and the club was confronted with an imperative necessity of adopting some plan by which to raise sufficient funds to meet its obligations. Neither the committee appointed to sell bonds nor any other member but Jackson is shown to have offered or suggested any expedient to meet this emergency. They were then willing to let Jackson do it if he could, and to contract with him for extra compensation for that special service if he succeeded. It was within the power of the board to make such special contract with its secretary. It was not for past services nor void. If obtained by unfair dealing or misrepresentation it would be voidable at the option of the board. The trial court clearly explained at length the trust relation of Jackson to the corporation as its secretary and member of its board of directors. Referring to the claim of defendant that Jackson knew Flanders had agreed to take the bonds and to the testimony upon the subject the court said:

"So in this case first determine the facts upon the issue I have just stated. Did Mr. Flanders stand ready, before the meeting of January 5, 1916, to take the issue of $50,000 bonds? Did he tell Mr. Jackson

that he would do that, even though it was upon the condition that certain legal formalities be complied with?    When this resolution was passed by the board of directors on the 5th of January, and that board resolved, or that board recited 'that the further sale of bonds to members of the club seems improbable—' did Mr. Jackson know at that time that it was probable that a sale could be made to a member of the club, because Mr. Flanders was a member.    Did Mr. Jackson permit his fellow directors to meet him under a mis-assumed fact when he could have set them right by imparting any information he had?    If he did and his purpose in keeping it back was to get this contract made by his fellow-directors, then there can be no recovery by the plaintiff in this case, because the law will not tolerate a person using his position as a director to induce his fellow-directors to enter into a contract with him through his withholding from them information he should impart."

Telling the jury that "the question of whether the bonds were sold through the efforts of Mr. Jackson is a question of fact for you to determine from the evidence" the court correctly instructed them upon the limit of time as follows:

"If Mr. Jackson performed the work; if he procured a purchaser for the bonds and the company got the benefit therefor and did receive the money knowing that Mr. Jackson was carrying on his effort beyond the period stipulated of two weeks from January 5, 1916, and worked with him in carrying out the plans, the defendant cannot now be heard to say that it was not completed within the two weeks."

Whether Jackson influenced Flanders to take the bonds and the time the latter agreed to do so were questions fairly in issue for the jury to decide.    Jackson testified that his attempts to get Flanders to take them before January 5th had been unsuccessful, that he got the idea of putting the offer on a more substantial and attractive basis from his interviews with the Security Trust Company and believed, as he

assured the board, if authorized to solicit on the plan he then proposed he could find a purchaser; that after his proposition was accepted by the board he took up the matter with Flanders who referred him to his secretary, Mr. Heft, working with and through whom he effected the sale. Both Flanders and Heft testify that Jackson interviewed them on the subject, but claim that Flanders had agreed to take the bonds before January 5th, and that his agreement to do so was not effected through Jackson's efforts. Counsel for defendant point as conclusive to Flanders' statement that Jackson—

—"in no way influenced me to purchase any of those bonds. * * * The proposition came from me, that if the matter was put in legal shape—the investment looked to be worth while—I would make the investment. I submitted that proposition to Mr. Jackson and to Mr. Heft. As near as I can fix the date it was in November or December, 1915."

He also testified:

"Jackson and other members of the club were discussing it whenever they met me, * * * Heft brought that matter to my attention from Jackson first, and I told Heft if it could be put in proper shape so it was satisfactory I would take them. * * * Jackson discussed the question of taking those bonds with me, but the date I have no way of fixing. * * * I do remember Mr. Jackson came there, came out to see me at one time with Mr. Heft."

Those were clearly issues of fact fairly laid before the jury by the trial court with full and plain instructions upon the applicable rule of law to guide them in their deliberations.

It is further claimed that defendant is entitled to a directed verdict under a state of the evidence showing express waiver of commission by Jackson. Numbers of the club testified to a conversation with

Jackson in which he said in effect, as stated by Heft, that "this commission was not to. be considered in putting over that deal." * * * The witnesses to that conversation are not in harmony as to who asked about a commission or just what language Jackson used. L. A. Young, who was elected president of the club, on the change of administration which Flanders had exacted, testified:

"Mr. Jackson spoke up and said that if the 5% would in any way stand or interfere—stand in the way of the deal, that he would waive his 5%."

Whatever may have been said in that connection no official action was taken by the board on the subject and the stockholders ratified the sale of bonds as outlined in the resolution of January 5th. Jackson secured the resignation of the old members of the board and assisted in electing the new board. He testified that he introduced Young to Flanders some time in January or February, that Young later took some of the bonds and when the new board of directors was elected Young became president of the club. While these matters were in progress and he was working out the details of his undertaking no question was raised by the board as to his being entitled to his commission, but on the contrary he was assured by the president he should have it, that the checks in payment of the bonds turned in to the new secretary after the election were given to him to deposit with the Security Trust Company which he did, taking a receipt therefor, saying in part:

"Before the checks were turned over to the Security Trust Company no question was ever raised between me and the officers or board of governors of the Red Run Golf Club as to whether or not I was entitled to my commission and no objection raised, except that they were short of money at the time, and Mr. Young told me as soon as he was president of the club he

would see that I got my money.    He told me that before he was elected president."

Young denied making such promise.  The court left the question of waiver to the jury, saying in substance that the burden of proof rested on defendant in that particular and if the jury were satisfied it was shown by a preponderance of evidence that Jackson, to meet a situation where the deal was jeopardized if a commission had to be paid, stated he would not ask a commission then he could not recover.

Of significance for consideration of the jury in passing on the testimony of witnesses was the undisputed early knowledge of the directors of certain facts they now urge as a defense after the successful termination of the financing project Jackson proposed.    They were told within two weeks after passing the resolution for a commission that Flanders was the purchaser.    He was a member of the club and testified that not only Jackson but other members of the club were discussing his buying those bonds whenever they met him.    If Jackson's waiver of a commission was essential for the deal to go through they knew it, but nowhere in their records is there any evidence of any official action questioning or repudiating their resolution contracting for his services in that undertaking.

Without further reviewing the testimony we find that the questions raised by appellant involved disputed issues of fact fairly submitted to the jury in a clear and careful charge on the details of which no error is assigned.    The evidence of defendant's witnesses if believed showed that Jackson withheld information which it was his duty to impart to his fellow directors, and thereby obtained favorable action on his claim for a commission to which he was not entitled.    He denied all charges of concealment or unfair conduct and told his story of the transaction

which, taken in connection with the written records of the club, entitled him to recover if the jury, who saw and heard all the witnesses, believed him.

This is essentially a jury case. It has been twice tried with like results. We are not prepared to find from this record as it reads that the court ought to condemn the judgment of the jury on this conflicting testimony and pronounce it so against the overwhelming weight of evidence as to result in such a miscarriage of justice as to demand another trial.

The judgment is affirmed.

FELLOWS, C. J., and MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred. WIEST, J., did not sit.