Argued November 9; affirmed December 21, 1948

# SEXTON *v.* KELLY
200 P. (2d) 950

*Howard P. Arnest,* of Portland, argued the cause and filed a brief for appellant.

*Joseph H. Page* and *Loyal H. McCarthy,* both of Portland, argued the cause and filed a brief for respondent.

Before Rossman, Chief Justice, and Belt, Bailey and Brand, Justices.

BAILEY, J.

This action was brought by plaintiff Fred F. Sexton doing business as Fred F. Sexton Co., to recover from defendant, Verna Kelly, $1,600 alleged to be due plaintiff as commission for producing a purchaser ready, able and willing to enter into a contract with defendant for the purchase of certain described real

property owned by defendant at the price and upon the terms specified by her, and for the further sum of $350 as attorney's fees. From a judgment in favor of defendant, plaintiff has appealed.

It is admitted that Fred F. Sexton is engaged in business at Portland, Oregon, as a real estate broker under the name of Fred F. Sexton Co.; that at all the times mentioned in the complaint plaintiff was and now is a duly and regularly licensed real estate broker under the laws of the State of Oregon; and that on April 26, 1946, defendant listed with plaintiff for sale certain described real property, owned by her, located at 4408 S. E. Hawthorne Boulevard, in Portland, Oregon, with the furnishings therein, at the price of $32,000, payable $10,000 cash and the balance secured by a mortgage payable in monthly installments of $150 with interest at 5% per annum on the unpaid balance. The listing agreement gave the plaintiff "the exclusive right to sell, exchange or convey the property" until May 26, 1946, and thereafter, until canceled in writing by defendant, a non-exclusive right to sell, exchange or convey such property. It is further provided in that agreement that "In the event of any sale, exchange or conveyance of said property during the life of this contract, or that you find a buyer ready and willing to enter into a deal or contract for said price and terms or on such other terms and price as may be agreed to by me * * * I hereby agree to pay you in cash, for your services in connection with this contract, the regular commission fixed by the Portland Realty Board," to wit, 5% of the listed or sale price.

It is alleged by plaintiff, and denied by defendant, that plaintiff on May 22, 1946, "found and produced

a purchaser for said property, ready, able and willing to enter into contract for the purchase thereof at the price and upon the terms" stated in the above-mentioned listing agreement and "secured from such purchaser an offer to so purchase defendant's said property accompanied by a deposit of $2500 as earnest money thereon; that said offer was submitted to defendant but that defendant refused to accept the same and refused to consummate said sale," and that plaintiff had performed all the terms and conditions of his employment "and earned and there became due and payable to him for services on account thereof the sum of $1600 which the defendant has failed, neglected and refused to pay." The principal question presented by this appeal is whether there is any substantial evidence to support the finding of the Circuit Court to the effect that plaintiff had failed to prove the foregoing allegations of his complaint.

Only two assignments of error are set forth in plaintiff's brief, the first of which is based upon the court "refusing to strike Exhibit 5 and in receiving Exhibits 6, 7 and 8." It is claimed that all these exhibits were irrelevant and immaterial, and in support of this contention it is stated that "Exhibit 5 served to prejudice the mind of the court * * * and Exhibits 6, 7 and 8 only added to the confusion." These exhibits were written offers made by the same prospective purchaser, Frank Lavorato, to the plaintiff to purchase defendant's property. They are what is commonly referred to as earnest money receipts. Exhibit 8 is dated May 6, 1946, and is an offer by Lavorato to pay $30,000 cash for this property; exhibit 7 is dated May 17 and is an offer by Lavorato to pay $31,500 cash; exhibit 6, dated May 18, is an offer to pay $31,000 cash;

and exhibit 5, dated May 22, is an offer to pay $31,500, payable $10,000 cash "and the balance at the rate of not less than $150 per month including 4% interest."

Mr. Dudley, a real estate salesman who acted for plaintiff in the negotiations between Lavorato and defendant, stated that exhibit 5 was prepared by him at the same time he prepared exhibit 4 on which plaintiff relies for recovery of his commission; that both of these exhibits were signed by Lavorato at the same time, and that both of them were presented by him, Dudley, to the defendant at the same time. Exhibit 4, dated May 22, is an offer of $32,000 by Lavorato, payable $10,000 cash "and the balance at the rate of not less than $150 per month including interest at 5%." Exhibits 4, 5, 6 and 7 all refer to a $2,500 deposit by check and the evidence shows that the only check for $2,500 which was given by Lavorato was one dated May 18, 1946. Dudley, in attempting to explain the variance in the date of the check and the date of the final offer made by Lavorato, stated that the same check was deposited in connection with the offers referred to in some of these exhibits to which plaintiff now takes exception.

██ At the time exhibit 5 was offered in evidence plaintiff's attorney stated that he had no objection to its introduction; therefore it was not error for the court to refuse to strike it. *Derrick v. Portland Eye, etc., Hospital,* 105 Or. 90, 100, 209 P. 344; 26 R. C. L., Trial, § 62, p. 1056. We are, however, of the opinion that exhibits 5, 6, 7 and 8 are relevant and material. All of them, Dudley testified, were presented to defendant upon their execution by Lavorato. They tend to show the course of dealings between plaintiff and defendant and to explain to some extent the conflicting testimony

of witnesses to which we shall refer in discussing the next assignment of error. These exhibits, however, were not essential to the prosecution or defense of the case.

The second assignment of error is based upon the refusal of the court to adopt the proposed findings of fact, conclusions of law and judgment submitted by plaintiff and in adopting those proposed by defendant, particularly finding No. III. The only essential difference between the findings made by the court and those submitted for adoption by plaintiff is in the wording of finding No. III and plaintiff's proposed finding No. III. Finding No. III is as follows:

"That the exclusive character of said listing expired May 26, 1946, and that thereafter defendant cancelled said listing by notification of said cancellation to the plaintiff in writing and that, prior to the receipt by plaintiff of said cancellation plaintiff had not produced to the defendant any person or persons ready, willing or able to purchase said property on the terms of said listing, or notified defendant of any such person or persons, nor had plaintiff obtained from any person or persons a binding agreement to purchase said property on the terms of said listing."

Plaintiff's proposed finding No. III is substantially the same as the controverted allegations of his complaint.

The defendant on May 28, 1946, wrote a letter to plaintiff withdrawing the listing of her property with him. This letter was sent by registered mail and was received by plaintiff on or about the 29th day of May. However, we do not consider the date of such withdrawal material in view of the following statement in plaintiff's brief: "Plaintiff's performance of his agree-

ment, that is, the procurement of the offer to purchase upon the terms specified by defendant, was complete before the expiration of the listing agreement. The acts of cancellation by defendant are of no consequence in this case except wherein such shows the plan of defendant to seek to avoid payment of her obligation to plaintiff.''

■ This is an action at law. The case was tried to the court without a jury and the findings of the court are conclusive if supported by substantial evidence. *Burke Machinery Co. v. Copenhagen*, 138 Or. 314, 6 P. (2d) 886; *Shaver Forwarding Co. v. Eagle Star Ins. Co.*, 177 Or. 410, 162 P. (2d) 789.

Hereinbefore, in discussing the first assignment of error, we have pointed out the difference between exhibits 4 and 5. On direct examination Dudley testified that exhibit 4 was submitted to defendant on the date it bears, May 22, and ''just a few minutes after Mr. Lavorato had signed the offer''. He stated that Mrs. Kelly did not want to sign it, that she ''wanted to wait for her son to come up first, and she said, well, she would think it over, and she didn't sign it, and that evening she called me up and said she would rather pay my commission than to pay Mr. Kelly $5,000 for signing the earnest money receipt.'' He stated that he had had no further conversation with her.

On cross-examination he stated that he had two earnest money receipts, exhibits 4 and 5, when he called on Mrs. Kelly on May 22nd. In discussing these two exhibits it must be borne in mind that exhibit 4 was for the full list price of $32,000 with interest on the unpaid balance at 5%, whereas exhibit 5 was for $31,500 with interest at 4% on the unpaid balance, and that

they were both dated May 22, 1946. We now quote from Dudley's testimony:

"Q. I am asking you if you were attempting to sell for the best offer. A. Yes.

"Q. How do you account for the fact you were taking two offers out there to her, having them both signed by Mr. Lavarato and yet submitting to her the offer Number 5, which is a lower offer than Number 4—or Number 5, which is an offer for $31,500? A. Miss Carnese and Mr. Lavarato made me the offer for thirty-one thousand five hundred, and we made the other one up at the same time,— they were both typed on the same machine, and this one was signed to take to her and the other one was not to be submitted to her if she received this one.

"Q. I have no doubt that is true, but what I am asking you is this: What do you mean by acting as agent for a lady and taking to her an offer of $31,500 when you have in your pocket at the same time an offer for $32,000? A. It was an agreement with Lavarato and Carnese that this offer was not to be submitted.

"Q. If she would take the other one. A. That is right, certainly.

"Q. Did you tell that to Mrs. Kelly? A. No; they were submitted in the same room at the same time.

"Q. Was Lavarato there? A. Yes, sir.

"Q. In the room? A. He knew that they were submitted.

"Q. So you mean to tell me that you showed her one copy for $31,500 and then turned right around and showed her another copy for $32,000? A. That is right.

"Q. How much of an interval of time was there between it? A. Oh, they talked it over between themselves, Mr. and Mrs. Kelly, for a half hour or so, read them over, and Mr. Kelly would go to

Mrs. Kelly and say, 'Here you are; what do you want to do? Do you want to sign this or not? It is up to you.'

"Q. Well, I am talking about what you were saying. A. I just stood there and listened to them.

"Q. Now then this offer which you say you took there on the date of May 22nd, plaintiff's Exhibit 5, shows interest at four per cent, doesn't it? A. That is right.

"Q. And didn't Mrs. Kelly tell you that she wouldn't take interest at four per cent? A. That is right."

■ At this point we consider it appropriate to make a few observations. Dudley, as agent for Mrs. Kelly, occupied a fiduciary relation and was required to act with the utmost good faith and loyalty in her interest, and there was imposed on him a positive duty of communicating to her all information material to her advantage which he might possess or acquire. 12 C. J. S., Brokers, § 41, p. 96; 8 Am. Jur., Brokers, § 86, p. 1035.

On cross-examination Dudley at first testified that exhibits 4 and 5 were "submitted in the same room at the same time." Later he testified that exhibit 5 was submitted first and the terms thereof were discussed by Mr. and Mrs. Kelly "for a half hour or so" while he "just stood there and listened to them." He testified that when he submitted exhibit 5 to Mrs. Kelly he said, "Here is an offer for your property if you would care to sign it," but we are not advised as to what he told her when he presented exhibit 4, which was a much better offer than that contained in exhibit 5, or what her reaction was on discovering that her agent had been withholding such offer from her. This action on the part of Dudley, however, did not seem to surprise the plaintiff. When the court told him that Dudley had testified that he had both offers in his

pocket he, Sexton, said, "Well, he is supposed to be representing both parties, no preference to either one of them." Both Sexton and his salesman Dudley showed by their testimony that they had a wrong conception of the duties of real estate brokers and salesmen. They were, or were expected to be, the agents of Mrs. Kelly and not of the prospective purchaser. "If you to serve two masters try, To one or other you'll have to lie."

Mr. Lavorato was called as a witness for the plaintiff and on direct examination testified as follows:

"Q. Were you there at the apartment on May the 22nd, the date that this last offer was made? A. Well, I can't recollect just exactly if I was there then or not, but I gave the check to Mr. Dudley—I think it was outside on the sidewalk that I wrote it out, in my car, you know what I mean. I can't remember. I didn't think anything like that would come up so I would have to remember everything.

"Q. Well, were you out at the place? A. Oh, yes, sure I was.

"Q. And did you know, or do you know whether or not that offer of $32,000, ten thousand cash and. $150 a month at five per cent, was submitted to this woman? Did she know it? A. Well, I would say yes; I would say yes. After we—making out a check like that a person takes for granted they submit it to them, wouldn't it?

"Q. Well, were you there and do you know that she— A. Oh, yes.

"Q. Well, do you know? What did she say about the offer? A. Well, I don't know. I can't remember anything like that."

He testified on cross-examination as follows:

"Q. Now on this day of May 22nd of last year when this Exhibit 4 was signed, were you out to the place [Mrs. Kelly's] on that day? A. Well, I was out there several times; lots of times.

"Q. And as to whether you were there on May 22nd you couldn't say? A. Well, I wouldn't say.

"Q. You just don't know? A. I wouldn't say."

Mrs. Kelly testified that Dudley and Lavorato brought her an offer for $29,000 or $29,500 and she thought that it was brought to her on May 22nd. We now quote from her testimony:

"Q. Now just state what occurred. Did they come inside the house? A. Yes, they came inside the house. Mr. Lavorato and Mr. Dudley stood by the door, I was standing by the window, and as a salesman will do, Mr. Dudley tried to bring me down and brought me the—he finally came over to the window, I suppose it was an earnest money contract, he wanted me to sign it, but it was for twenty-nine thousand; it might have been five hundred.

"Q. Did you look at it? A. I glanced at it. It was twenty-nine thousand. Mr. Kelly said, 'Don't sign it.' I never had it in my hand, neither did Mr. Kelly, and we didn't discuss it. He simply said, 'Don't sign it,' and I didn't.

\* \* \*

"Q. Did they make more than one offer on that occasion when they were out there? A. No, that was the only offer.

"Q. $29,000? A. Twenty-nine thousand."

She stated that other offers had been made to her over the telephone. One offer was, to the best of her recollection, for $30,000 cash, and another was for thirty some thousand dollars with interest at four per cent. She testified that she had rejected these offers because they were not in conformity with her listing.

We quote further from her testimony:

"Q. Now you had signed up to sell for $32,000 on this Exhibit here, Plaintiff's Exhibit 1. Did

they ever bring you an offer— A. They never brought me an offer for $32,000. They brought me one for twenty-nine thousand, it might have been five hundred. He tried to bring Mr. Lavorato up and me down.

"Q. Now did you ever see this Exhibit 4, which is an offer of $32,000 and interest at five per cent? A. No.

"Q. Was that offer ever exhibited to you? A. It was never brought to me.

"Q. It was never brought to you at all? A. No; he never brought me an offer for that price."

 It is not the function of this court in law actions to pass on the credibility of witnesses, to weigh the evidence, or to resolve the conflicting testimony. These are matters for the determination of the Circuit Court. It is, however, the province of this court, when properly presented, to decide whether there is substantial evidence to support the findings of the court or the verdict of the jury, as the case may be. In our opinion the findings of the Court in the instant case are supported by substantial evidence and are sufficient to sustain the judgment.

The judgment appealed from is affirmed.