Argued April 13, affirmed July 31, 1962

# WIDING et al v. JENSEN, REAL ESTATE COMMISSIONER

373 P. 2d 661

*William A. Martin,* Portland, argued the cause for appellants. On the briefs were Davis, Jensen, Martin & Robertson, Portland.

*H. William Barlow,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

Before McALLISTER, Chief Justice, and WARNER, SLOAN and O'CONNELL, Justices.

WARNER, J.

This is an appeal from a judgment of the Circuit Court for Marion County affirming a decision and order of Robert J. Jensen, State Real Estate Commissioner. The Commissioner's order suspended the real estate license of petitioner Widing for 15 days and the license of petitioner Girtler for 60 days. The hearing before the Commissioner was had pursuant to ORS ch 183 and the review by the circuit court in the manner provided by ORS 183.480.

Petitioner Widing does business in Portland, Oregon, under the assumed business name of Certified

Realty Co. Girtler was a real estate salesman employed by Widing.

James R. Conway and Edna A. Conway, in November, 1960, filed a complaint with the Real Estate Department of the state alleging that on or about June 27, 1960, Certified Realty Co. (hereinafter called the Company) purchased certain real property from the Conways for $11,466.73. It was a parcel the Conways had listed with the Company on January 29, 1960; that prior to the time of the sale by the Conways to the Company, the Company had received an offer of purchase from Mr. and Mrs. H. R. Darrow for a price of $13,000, but had never submitted the Darrow offer to the Conways; and that the Company subsequently sold the Conway property to the Darrows for $13,000.

At the conclusion of the two hearings had on the Conway complaint the Commissioner made the following findings of fact:

"That defendants Don J. Widing and J. M. Girtler, while acting as agents for complainants for the sale of certain real property, did purchase said real property from complainants without advising them of an outstanding and existing offer for the purchase of said premises by Harold R. Darrow and Pauline H. Darrow; that said defendants later sold said premises to the Darrows."

Based upon these findings, the Commissioner concluded that petitioners violated ORS 696.300(1)(q)①

---

① ORS 696.300(1) enumerates the grounds upon which the Commission may suspend or revoke any license issued under ORS ch 696. The one designated (q) reads:

"Any act or conduct, whether of the same or a different character than specified above in this section, which constitutes or demonstrates bad faith, incompetency or untrustworthiness, or dishonest, fraudulent or improper dealings."

and thereafter entered the suspension order from which petitioners appealed to the circuit court.

ORS 696.300 (1)(q) embodies a statutory statement of the long-recognized common-law rule of the fiduciary relationship thrust upon a real estate broker exacting duties and obligations to his principal and as more recently stated in *Prall v. Gooden,* 226 Or 554, 561, 360 P2d 759 (1961), is as follows:

> "It also must be kept in mind that a real estate broker stands in a fiduciary relationship with his customer or client and is thus bound to protect his clients' interests. He must, therefore, make a full, fair and understandable explanation to the client before having him sign any contracts, particularly when those contracts are with the broker himself. *Sexton v. Kelly,* 185 Or 1, 9, 200 P2d 950; 12 CJS, Brokers 96, § 41; 8 Am Jur, Brokers 1035, § 86."

■ See, also, *Parker v. Faust,* 222 Or 526, 529-530, 353 P2d 550 (1960). For a succinct statement see Restatement, 2 Agency 2d, 208, § 390, and quoted with approval in *Prall v. Gooden,* supra, at 563. It is a relationship which also casts upon the broker the burden to show that there was a full and complete disclosure and that the broker did not reap a secret profit. *Parker v. Faust,* supra, at 530, and cases there cited.

The questions presented for our decision are: (1) Does the evidence substantiate the findings of the Commissioner and the circuit court that petitioners purchased the Conway property while acting as their agents and without advising them there was an existing offer from the Darrows for the purchase of the property at the time of its purchase from the Conways by petitioners? (2) Did the acts of petitioners in

their dealings with the Conways constitute "bad faith, incompetency or untrustworthiness, or dishonest, fraudulent or improper dealings" within the meaning of ORS 696.300? Based upon the following summary of the facts, we conclude that each of these questions must be answered in the affirmative.

On January 29, 1960, the Conways executed a listing agreement employing Certified Realty Company to sell their residence for $13,500. This listing was obtained by petitioner Girtler. It conformed in all respects to the Statute of Frauds (ORS 41.580(7)). The termination date of the listing was April 30, 1960. During the intervening 90-day period the Company, acting through Girtler, advertised the property and diligently endeavored to sell it, but received no offers. But notwithstanding, Girtler continued, with the acquiescence of the Conways, to advertise and show the property, still without success.

On June 18, 1960, Mrs. Conway and Girtler discussed the possibility of petitioners purchasing the property and on June twenty-first both the Conways met with Girtler and discussed further the terms of such a sale.

Two days later the Conways again met with Girtler and at that time signed an earnest money agreement again listing the property with Certified Realty Co. and agreeing to sell for a price that would net $1,600 cash to the Conways. That amount represented their equity in their property as computed by Girtler. It was figured on a value of $12,750. However, in settling upon the recited sale price of $11,466.73 (previously referred to) Girtler deducted from $12,750 a figure estimated as the FHA mortgage discount, and also $750 or $780 as a commission to the Company.

At the same time Girtler accepted the listing in behalf of the Company and gave the Conways his promissory note for the amount of $1,600. On June twenty-seventh petitioner Widing on his return to the city signed the "agreement to purchase" portion of the earnest money agreement in behalf of the Company.[2] On July 8, 1960, Certified Realty sent the Conways a check for $1,594.[3]

At least a week prior to the time that the Conways sold their property to petitioners the Darrows had been shown the Conway property twice and had consulted with Girtler concerning it. On June 25, 1960, Girtler filled out another earnest money agreement which was signed by the Darrows. In this they agreed to buy the Conway property for $13,000. The Darrows evidently did not have sufficient cash with which to purchase the Conway residence, but they did have an equity in other property owned by them which they conveyed to the Company. The equity of the Darrows was placed at $1,000 and used as a down payment for the purchase of the Conway parcel from the Company.

The Darrow's earnest money agreement discloses that the offer to sell the property to them was made by Girtler on June 25, 1960. The Darrow's offer to purchase was accepted by petitioner Widing on June twenty-seventh, the same date he accepted the Conway's offer to sell.

Mr. Darrow testified that about a week before he signed the earnest money agreement he had called Girtler and told him he was interested in the house

---

[2] The record discloses that the purchase made by the Company was in behalf of Widing and Girtler and on terms previously discussed with Widing by Girtler and approved by the former. Widing's interest in the deal was 75 per cent and Girtler's 25 per cent.

[3] The difference in this amount and $1,600 is explained by the withholding of $6 to cover an unpaid water bill.

and wanted to "work out some kind of a deal." There is nothing in the record to indicate that the display of interest by the Darrows as potential purchasers was ever communicated to the Conways until after the two sales of their property had been consummated, i.e., the sale from the Conways to the Company and the almost coincidental resale of the same parcel by the Company to the Darrows. It was not until July 1, 1960, or thereafter, that petitioners informed the Conways of the sale to the Darrows.

Petitioners rest their defense primarily upon the representation that there was no brokerage relationship subsisting between them and the Conways after April 30, 1960, the termination date of their first listing agreement. This assertion is without merit.

■ A provision in a contract terminating it as of a given date, like the one in the present case, is for the benefit of the principal, and like all other provisions in favor of a party, may be waived if he chooses, either expressly or impliedly. *Wallace v. Oregon Engineering Co.,* 90 Or 31, 36, 174 P 156, 175 P 445 (1918); *Smith v. Martin,* 94 Or 132, 138, 185 P 236 (1919); *Cross v. Campbell,* 173 Or 477, 493, 146 P2d 83 (1944); 17 CJS 894, Contracts § 405; 12 Am Jur 1030, Contracts § 449.

■ The time of performance specified in a broker's contract, as in other contracts, may be waived by the principal where he, after the time limit has expired, urges and encourages the broker to continue his efforts and the broker does so continue with the knowledge, approval and encouragement of the principal. *Rawlings Mfg. Co. v. Red Run Golf Club,* 220 Mich 30, 189 NW 877, 879 (1922); *Gulf Trading Co. v. Radcliff,* 216 Ala 645, 114 S 308, 315 (1927); *Moran v.*

548

*Bair,* 304 Pa 471, 156 A 81, 82 (1931); *Baker v. Curtis,* 105 Cal App2d 663, 234 P2d 153 (1951); *Ridgway v. Chase,* 122 Cal App2d 840, 265 P2d 603, 609 (1954). The time limit of a brokerage contract may be waived or impliedly extended by the seller. Annotation, 27 ALR2d 1355 (1923), and cases there cited.

In *Everson v. Phelps,* 104 Or 288, 206 P 306, 26 ALR 780 (1922), when considering a brokerage contract, we said at 295:

> "The principal waives performance within the time limit when he accepts the services of the broker and recognizes and treats the contract as still in force: * * *."

■ There is, however, no absolute test for the ascertainment of waiver or extension of time; such is a question of fact for the determination of the court. *Kraemer v. Smith,* 179 Cal App2d 52, 3 Cal Reptr 471 (1960); *Filante v. Kikendall,* 134 Cal App2d 695, 286 P2d 448, 451 (1955).

In the *Filante* case the broker continued to show the property after the expiration date and the owners knew of his efforts and at no time disapproved. The court held under the circumstances an extension resulted from the owner's waiver. As said in 12 CJS 40, Brokers § 15:

> "Evidence of acts by the broker of such nature and so continuous as to justify a reasonable inference that the principal knew of them and would not have permitted them if unauthorized, is admissible as competent evidence of the agency. * * *"

An extended Annotation, 140 ALR 1019 (1942), entitled "What amounts to waiver of termination of real estate broker's contract," sets forth the general

rule that in situations where, after the apparent termination of a brokerage agreement, the broker continued his efforts to find a purchaser, with the knowledge and consent of the principal, the termination of the contract will be considered waived.[4] Of particular interest is *Bell v. Scudder*, 78 Cal App2d 448, 177 P2d 796 (1947), wherein a broker's renewal license was suspended due to his activities which were factually similar to those existing in the matter at bar. The *Bell* case held that although a 60-day listing agreement period had terminated, the broker still owed the owners a fiduciary duty for he continued attempting to sell their property and the parties assumed that the agency relationship was still in force.

█ In our opinion the following uncontradicted facts establish that the time of the Conway first listing agreement had been waived by the Conways and was well known to and relied upon by petitioners and that they continued to act without interruption as the Conway's broker from January 29, 1960, to and until June 27, 1960, the date of the sale of the Conway property to the Company.

The Conway place is only a block from the office of the Company. It was their place of residence at all times herein mentioned up to their sale to the Company. It was also close to where Girtler lived. Because of this proximity and the earnest desire of the

---

[4] The following cases, in addition to others previously cited, exemplify circumstances which evidence an extension of a real estate broker's contract by waiver of the termination date. Holbrook-Blackwelder Real Estate & Trust Co. v. Hartman, 128 Mo App 228, 106 SW 1115 (1908); Ice v. Maxwell, 61 W Va 9, 55 SE 899 (1906); Noyes v. Caperton, 68 W Va 13, 69 SE 364 (1910); Partee v. Pepple, 197 Miss 486, 20 S2d 73, 78 (1944); Lawson v. Black Diamond Coal Mining Co., 53 Wash 614, 102 P 759, 760 (1909); Stiewell v. Lally, 89 Ark 195, 115 SW 1134, 1138 (1909).

Conways to sell and Girtler's continuing interest in so serving them, it is apparent that they frequently saw each other from the date of the initial listing until June 27, 1960. According to Girtler, he and the Conways discussed "innumerable times" the status of possible sale before and after the expiration date of the listing. Nothing marks an abatement of the Conway eagerness to sell nor Girtler's activities as their broker during this period. A "For Sale" sign remained on the premises, presumably one of the broker's, and this was still there when the Darrows made their inspection of the Conway home. Mrs. Conway would escort prospective buyers through the house and did so on two occasions when the Darrows visited the place in June, 1960. On both of these Darrow inspections Girtler accompanied them.

Girtler, in telling of his efforts to sell the place, testified that after April 30, 1960, "I advertised it, I held it open, I showed it. I'm quite sure they [the Conways] felt satisfied that I was doing everything in my power to sell that property." The Conways knew of Girtler's efforts and were apparently satisfied with them until sometime in June when at one time they "considered turning it in to another broker." They discussed this possible change in brokers with Girtler but were dissuaded in so doing and shortly after, i.e., June twenty-third, signed the papers which resulted in their sale to the Company. We also note that the Conway-Company deal of June twenty-third included a broker's commission of $750 to $780 to the Company for its services in buying the property from the Conways. This produces some wonderment. If a listing contract is nonexistent, as contended by petitioners, there was no basis to support a commission and the same is true if "this was a transaction between

principals, and not between a principal and agent," as declared in their brief.

We are of the opinion that the expiration date established by the listing agreement of January 29, 1960, was waived and the time for the broker's efforts extended and that petitioners' fiduciary duties and obligations to the Conways were continuously existent up to and including June twenty-third and thereafter until the Conway-Company deal was consummated. As said in *Gulf Trading Co. v. Radcliff,* supra (114 S at 315), "Extension of time for the purpose of reaping benefits should extend it as to obligations." The obligation of petitioners here was their duty to disclose to the Conways *"all* information concerning the prospective sale of the property" to the Darrows. (Emphasis supplied.) *Parker v. Faust,* supra (222 Or at 530). This they did not do.

Petitioners have gone to some length in an attempt to show that the Conways would not have been interested in any offer the Darrows could have made, since the Conways only wanted cash for their property and the Darrows were not in a position to pay cash. We view this as a false assumption since the Darrow offer was never communicated to them. It is an irrelevant observation when the failure of petitioners to communicate the Darrow offer is the prime issue in this matter. Moreover, no one is in a position to say what disposition might have been made of the offer by the Conways if they had been fully advised and had elected to negotiate on terms proposed by the Darrows.

■ Petitioners represent that they received no advantage as a result of the Conway sale to the Company instead of dealing directly with the Darrows. Whether

a gain or loss was sustained by petitioners is likewise immaterial. The law does not make the attainment of an advantage by the broker or salesman a necessary prerequisite to a showing of guilt under ORS 696.300(1)(q). See *St. Germain v. Watson,* 95 Cal App2d 862, 214 P2d 99, 104 (1950).

For cases from other jurisdictions construing statutes similar to those of Oregon and holding that a failure to reveal material facts constitutes grounds for revocation or suspension of a broker's or salesman's license, see Annotation, 56 ALR2d 573-605 (1957), "Grounds for revocation or suspension of license of real-estate broker or salesman."

Affirmed.