Argued January 7, affirmed March 10, petition for rehearing
denied April 13, 1971

FERRIS, *Respondent, v.* MEEKER
FERTILIZER COMPANY, *Appellant.*

482 P2d 523

*Norma Paulus*, Salem, argued the cause and filed the brief for appellant. With her on the brief were Clark & Marsh, Salem.

*H. William Barlow*, Salem, argued the cause for respondent. With him on the brief were Allen, Stortz & Barlow, Salem.

Before O'CONNELL, Chief Justice, and HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

HOWELL, J.

Plaintiff brought this action to recover a real estate commission. A jury returned a verdict for plaintiff and defendant appeals from the judgment.

The defendant's primary contention is that the trial court erred in denying its motions for a judgment of involuntary nonsuit and for a directed verdict.

There is a substantial conflict in the testimony, but in deciding whether the trial court erred in overruling the defendant's motions, we are required to view the evidence in the light most favorable to the plaintiff.

On January 20, 1967, Frank Meeker, president

of defendant corporation, listed a farm for sale with the plaintiff through Louise Wolf, a licensed real estate saleswoman employed by plaintiff. The listing agreement, which was to expire on May 1, 1967, was subsequently extended through August 7, 1967. In the spring of 1967, Mrs. Wolf contacted Crown Zellerbach Corporation, which had indicated an interest in purchasing the property for a Christmas tree farm. Various representatives of Crown Zellerbach, together with Mrs. Wolf, viewed the property on several occasions. On May 22, 1967, Crown Zellerbach executed an earnest money agreement to purchase the property subject to the approval of its Board of Directors. On June 22, 1967, Crown Zellerbach notified Mrs. Wolf that the Board of Directors had not approved the purchase, and the earnest money was returned to Crown Zellerbach.

Although the Board of Directors had disapproved the purchase, one of the officials of Crown Zellerbach, George Harrington, who was in charge of Christmas tree sales, continued to show an interest in the property. While some Crown Zellerbach officials considered the purchase a "dead issue," others regarded the Meeker property as a worthwhile investment and were disappointed at the rejection.

Mrs. Wolf testified that, after the rejection by the Board of Directors, she was informed by Harrington that Crown Zellerbach was still interested in purchasing the property and so advised the defendant.

In October, 1967, Mrs. Wolf moved to the Eugene area from Salem. On June 26, 1968, she returned her realtor's license to the Oregon State Real Estate Commissioner and was placed on inactive status. On or about October 1, 1968, Mrs. Wolf was advised by

Crown Zellerbach that a new analysis of the Meeker property had been made and that they wanted to purchase it. On September 30, 1968, Mrs. Wolf applied for reinstatement of her license and was reinstated on October 1, 1968.

In November, 1968, Crown Zellerbach advised defendant that it accepted the offer to sell, and the sale was consummated in December, 1968. The defendant refused to pay a commission to plaintiff, and plaintiff filed this action for $10,500 commission and attorney fees.

The principal question in the instant case is whether defendant waived or impliedly extended the time limit in the listing by knowingly approving and encouraging Mrs. Wolf to continue her efforts to sell the property.

The general rule is that "the time of performance specified in a broker's contract, as in other contracts, may be waived by the principal where he, after the time limit has expired, urges and encourages the broker to continue his efforts and the broker does so continue with the knowledge, approval and encouragement of the principal." *Widing et al v. Jensen, Real Estate Com.*, 231 Or 541, 547, 373 P2d 661 (1962); *Everson v. Phelps*, 104 Or 288, 206 P 306, 26 ALR 780 (1922); 12 Am Jur 2d 959, Brokers § 219 (1964). There is no absolute test for the ascertainment of waiver or extension of time; it is a question of fact in each case. *Widing v. Jensen, supra.*

■ Among the factors to be considered are whether the principal accepts the services of the broker and recognizes the contract as still in force, *Everson v. Phelps, supra,* at 295; *Widing v. Jensen, supra,* at 547; *see generally* Annot., 27 ALR2d 1348 (1953);

Annot., 140 ALR 1019 (1926); and whether negotiations with the prospective purchaser continued or were interrupted before the contract was consummated. Annot., 27 ALR2d, *supra*, at 1379. It is not fatal if the negotiations were interrupted if the continuity of the broker's agency in bringing the transaction to a conclusion is established. *Arnett v. Scherer*, 142 Or 494, 500, 20 P2d 803 (1933). Other factors considered are the length of time after the expiration of the listing to the time of sale, *see* Annot., 27 ALR2d, *supra*, at 1390; and whether or not the broker abandoned the agency contract, Annot., 27 ALR2d, *supra*, at 1402.

Mrs. Wolf testified that she talked to Meeker "several times" between August 7, 1967, when the listing expired, and the first of October, when she moved to the Eugene area. She told Meeker that she understood Crown Zellerbach was trying to find "a new approach in order to sell it to the Board of Directors." When she was ready to move, in October, 1967, she advised Meeker to list the property with other brokers "because our office did not normally handle farms and I didn't think he would get the kind of service he wanted." She also suggested that he exempt Crown Zellerbach from the other listings. She told Meeker at that time that she felt the "deal was still alive." Meeker told her that if Crown Zellerbach wanted it "they had better get with it because he wanted to sell the property." Meeker did list the property with several other brokers and exempted Crown Zellerbach from one of the listings.

While Mrs. Wolf was living in the Eugene area, she returned to Salem frequently. From November, 1967, until September 30, 1968, telephone records showed that she called Crown Zellerbach once in No-

vember, 1967, and twice in January, 1968, from her home in Eugene; that she called Crown Zellerbach twice in October, 1967, from the office in Salem. In May or June, 1968, she called Harrington and invited him to go fishing. Also, in May or June, 1968 (presumably before she placed her license on the inactive list), she was in the Crown Zellerbach office in Portland, and Schroeder, the Crown Zellerbach forester, told her that Harrington was still "working" on the Meeker property. She testified that she reported this conversation to Meeker, and he said he hoped Crown Zellerbach would buy the property, "but if they didn't pretty soon he would sell it to someone else."

Regarding her actions when she was advised in October, 1968, that Crown Zellerbach was willing to buy the property, Mrs. Wolf testified as follows:

"A. Well, I called Mr. Meeker—I called Mr. Ferris' office and told Mr. Ferris what was happening, and I called Mr. Meeker and told him that Crown Zellerbach was ready to go ahead on the transaction, to close it, and he said, that was fine. He told me he had a listing, an exclusive listing out but he exempted Crown Zellerbach, and I said, that is fine, and he said he was happy about it and did I have the check or was it firm, did I have the papers in my hand? I said, no, I don't; they have to mail them from the Portland office, or mail their request to either the San Francisco or Los Angeles office to get the funds and the funds to complete the purchase, but it has been okayed by the board of directors of Crown Zellerbach but they haven't finished the paper work yet.

"Q. That was your discussion with Mr. Meeker?
"A. Yes, Mr. Meeker. Frank Meeker. That Mr. Christy said we should have them within the

next week or ten days, the final papers. Mr. Meeker said that was fine, but he said he had another offer going on it, that if Crown Zellerbach hesitated on it or if the other people came up first he would sell it to them instead of Crown Zellerbach. I said, we know we run that risk, and Mr. Meeker said that, as I recall—I said, I knew they would come through for us, and he said, I always felt they would buy it, too, and he seemed happy about it at that time. There was no discord."

After a week or ten days, when the sale documents had not arrived from Crown Zellerbach, Mrs. Wolf was advised by Crown Zellerbach that Meeker was not going to recognize the listing and was going to sell direct to Crown Zellerbach.

Harrington testified that the Meeker purchase was a "continuing transaction" as far as he was concerned, and that he received permission from a vice-president of the company "to continue to see if this could be an economic purchase." From the time of the rejection of the purchase by Crown Zellerbach in June, 1967, until the purchase in November, 1968, Harrington called both Meeker and Mrs. Wolf five or six times and advised them that "we were still going to try to purchase it."

Meeker, however, testified that he had "absolutely no conversation" with Harrington or Mrs. Wolf regarding the sale from the time of the rejection by Crown Zellerbach in June, 1967, until October, 1968.

■ We conclude that the evidence presented a question of fact for the jury to decide whether the plaintiff, through Mrs. Wolf, continued to attempt to sell the property to Crown Zellerbach and did so with the knowledge, approval and encouragement of the

defendant, which, if true, would result in a waiver or implied extension of the listing agreement. The jury apparently believed the testimony of Mrs. Wolf and Harrington. That finding is binding on us.

■ The defendant has contended that any extension, express or implied, of the time prescribed in the listing agreement is within the statute of frauds, ORS 41.580 (7).

The cases cited by defendant, *United Farm Agency v. McFarland*, 243 Or 124, 411 P2d 1017 (1966); *Kingsley v. Kressly*, 60 Or 167, 111 P 385, 118 P 678 (1911); and *Neppach v. Or. & Cal. R.R. Co.*, 46 Or 374, 80 P 482 (1905), are not applicable because none of them involved an express or implied extension of the time of performance by a broker under a listing agreement with his principal.

In the *United Farm* case the court found it unnecessary to decide whether an oral agreement to modify the time and manner of paying a broker's commission violated the statute of frauds, ORS 41.580 (7), and decided the case on other grounds.

In *Slotboom v. Simpson Lumber Co.*, 67 Or 516, 135 P 889, 136 P 641 (1913), also cited by defendant, the plaintiff, a broker, sought to recover a commission from the defendant for selling defendant's land. Contrary to the instant case, the plaintiff alleged and relied upon an oral modification of the original listing extending the time and reducing the price. The court held that time was of the essence of the listing, and stated:

> "* * * Any modification of the authority conferred upon the plaintiff by the written instrument, to secure a purchaser of the property, after the expiration of the time thus limited, was a new

contract, which agreement, under our statute of frauds, was required to be evidenced in writing. * * *." 67 Or at 525.

The court did not discuss the question of whether a principal may waive or expressly or impliedly extend the time for performance by his broker. To the extent that *Slotboom* could be construed to prevent a waiver or an express or implied extension of time for performance by a principal unless such an extension is in writing, it is overruled. In *Widing v. Jensen, supra,* we expressly held that a provision in a listing agreement terminating it as of a given date is for the benefit of the principal and that the principal, by his acts and conduct, may waive or expressly or impliedly extend the time for performance. *See also* Annot., 27 ALR2d 1348 (1953).

Here, the plaintiff does not rely on a modification of the original listing agreement resulting in a new contract; the plaintiff contends that the original listing remained in effect and that defendant waived or impliedly extended the time for performance by accepting the broker's continued negotiations with Crown Zellerbach. Moreover, if the broker were required to have a new listing or a written extension of the old listing in order to satisfy the statute of frauds, he would not be able to rely on the acts and conduct of the principal to invoke a waiver or an express or implied extension of the time in the original listing.

■ The defendant also contends that the plaintiff is precluded from claiming the commission because Mrs. Wolf placed her real estate license on inactive status from June 26, 1968, until October 1, 1968.① De-

---

① ORS 696.020 provides that no person shall engage in or carry on or advertise or hold himself out as engaging in or

fendant cites *Certified Realty v. Reddick*, 253 Or 617, 456 P2d 502 (1969); *Miller v. Ziedrich et al*, 199 Or 505, 263 P2d 611 (1953); and *Hunter v. Cunning*, 176 Or 250, 154 P2d 562, 157 P2d 510 (1945). They are not comparable to the instant case.

In *Certified Realty* a listing agreement was obtained in Washington by a broker's agent who was licensed in Oregon but not in Washington. We held that such conduct constituted illegal practice, even though the salesman had obtained a Washington license prior to the consummation of the transaction, and though his broker was licensed in Washington.

In *Miller v. Ziedrich* the brokerage contract was between a real estate salesman who was not licensed as a broker and his principal. We held that the contract was void because the selling activities of the salesman must be restricted to activities as an employee of or on behalf of a broker and the salesman may not lawfully accept a commission from anyone except a broker, or be employed by anyone other than a broker under whom he is licensed at the time.

In *Hunter v. Cunning* it was held that where plaintiff entered into a listing contract with the seller without first obtaining a license as required by statute, the contract was illegal because the plaintiff was not a duly licensed real estate broker at the time the alleged

carrying on the business, or act in the capacity of, a real estate broker or a real estate salesman within this state without first obtaining a license as such.

ORS 696.226 provides that during the time a salesman's license is being held by the commission as an inactive license, the licensee shall not engage in real estate business.

ORS 696.710 provides a real estate broker cannot maintain a cause of action without alleging and proving that such person was a duly licensed real estate broker at the time the alleged cause of action arose.

"cause of action arose." The phrase, "at the time the alleged cause of action arose" was interpreted:

> "* * * as meaning at the time, or throughout the period, when the broker performed the services which culminated in the accrual of his cause of action. By this, we meant that the quoted expression did not refer to a particular moment of time when the cause of action accrued, but to the whole period covered by the rendition of the broker's services." 176 Or at 290.

None of the above cases hold that it is fatal to a plaintiff's action for a commission if the license of the broker's agent is placed on inactive status for a period during the selling negotiations. In the instant case, Mrs. Wolf was duly licensed at the time she obtained the listing agreement with defendant, at the time the agreement expired, and at the time of defendant's sale to Crown Zellerbach.

A similar case is *Pierce v. Isabel*, 70 Ohio App 385, 40 NE2d 481, 46 NE2d 292 (1941). The Ohio statute required a broker or real estate salesman to be licensed, and provided that each license expired on the 31st of December of the year it was issued. The statute also provided that the license might be renewed by application made within 90 days after the term of its expiration, "without recommendation, examination or inquiry."

There, the license of the plaintiff, who had been duly licensed the previous year, expired on December 31, 1938, and the new license was not issued until February 28, 1939. The plaintiff entered into a listing agreement with defendant on February 3, 1939, and the defendant breached the agreement on June 28, 1939, when it sold the property to others. The court held that plaintiff was not precluded from re-

covery because plaintiff was not licensed on February 3, 1939, as his "cause of action arose" when the defendant breached the agreement on June 28, 1939, and the plaintiff was licensed at that time.

We conclude that plaintiff in the instant case is not precluded from recovery merely because Mrs. Wolf's license was on inactive status from June 26, 1968 to October 1, 1968. Brokers and salesmen are required to be licensed for the protection of the public. The record does not disclose that Mrs. Wolf engaged in any selling activities from June 26 until September 30, when she filed her application for renewal of her license.

We believe that the primary importance of Mrs. Wolf's inactive status for approximately three months relates to the question of the continuity and extent of her negotiations with defendant and Crown Zellerbach during the 15-month period from the time the listing expired to defendant's sale to Crown Zellerbach. As we have previously decided, these issues were properly submitted to the jury.

Affirmed.