Argued December 7, 1960, reargued February 15,
reversed and remanded April 5, 1961

## PRALL *v.* GOODEN ET UX
360 P. 2d 759

E. L. *Crawford,* Salem, argued the cause and filed briefs for appellants.

*Keith D. Evans,* Salem, argued the cause for respondent. On the brief were Evans & Miller, Salem.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL, and GOODWIN, Justices.

GOODWIN, J.

Defendants appeal from a judgment for the plaintiff in an action to recover two real-estate-broker's commissions totaling $1,325.00.

The broker sued upon a written agreement which he had prepared on a printed form entitled "Contract for Exchange of Real Property". The contemplated exchange of property, which never took place, would have obligated the defendants to pay the broker a commission of $775 for his efforts in disposing of the property which they were exchanging. If performed, the agreement also would have obligated the other parties to the transaction to pay a commission of $550.

The vital clause of the printed form reads as follows:

> "And in consideration of the mutual promises herein contained it is further agreed that should either party hereto fail to perform and carry out his part of this agreement, such party, so failing, shall pay all of the brokers' commission below provided for, this promise being made directly for said brokers'·benefit."

The day after they signed the "Contract for Exchange of Real Property" the defendants notified the other parties, a Mr. and Mrs. Trask, that they could not go ahead with the transaction. Their stated reason for nonperformance was that they had signed the agreement under a mistaken impression that they would receive needed cash, through a series of transactions to be described hereinafter, and that when they found that there was no likelihood of receiving any appreciable amount of cash they decided not to proceed with the transaction.

The Trasks apparently consented to the cancellation and have no interest in this case. The broker, believing that he had earned the double commission, brought this action. The defendants declined to seek equitable relief in their answer. The defendants alleged that the broker had not earned his commission because he had secured their signatures upon the written agreement by fraudulent misrepresentation. The answer further alleged that the broker had breached a fiduciary relationship, in that the scheme was motivated by self-interest in disregard of the rights of the defendants. If consummated, the proposed exchange scheme would be profitable only to the broker and not to the defendants, according to their answer.

No demurrer or motion was interposed against the answer. We will treat it as stating a breach of a fiduciary relationship, although as a pleading it leaves much to be desired.

Trial by jury was waived and the court made findings and conclusions and entered judgment for the plaintiff. The facts are as follows.

The defendants were the owners of a five-acre tract in Marion County, Oregon, known to the record as

the "Fletcher Road property". The plaintiff was a licensed real estate broker. On May 3, 1957, the broker solicited the defendants and received a listing of the above property for sale at $15,500, with a commission of 5% payable to the plaintiff if a sale was made according to the terms of the listing. The terms included a $3,000 minimum down payment, with the balance payable at $95 per month with interest at 6% per annum.

The broker had no success in finding a buyer. Shortly after taking the listing, he attempted to arrange a trade whereby the defendants would receive the Trask property, known to the record as the "Madison Street property", in exchange for the "Fletcher Road property". The "Madison Street property" would have been given a trade value of $11,000. There was an F.H.A. mortgage of $4,916 against the Trask property which the defendants were to assume. An equity of $6,084 would thus be applied on the $15,500 exchange price of the defendants' property, leaving a balance due the defendants from the Trasks in the amount of $9,416. To the $9,416 was to be added $400, which the defendants were to advance to Trasks to enable them to pay their part of the broker's commission. Thus, a total of $9,816 would be owed by the Trasks to the defendants. It was proposed that this balance be paid at the rate of $76 per month, which payment was to include interest at 6%, taxes, insurance, and principal.

The defendants rejected this scheme because the payments they would receive from the Trasks would leave them very little cash after the defendants made the payments on the F.H.A. loan they were to assume. Their purpose in selling the "Fletcher Road property" was to secure cash to take care of obligations

on other property where they were making their home. This purpose had been made clear to the plaintiff.

The broker thereupon prepared another proposal, in which he would personally purchase the "Madison Street property" from the defendants after the proposed exchange, at a discount price of $9,500, or $1,500 less than they were allowing the Trasks for it on the trade. The broker said he would attempt to resell it for cash and upon such an event would pay the defendants any balance then due them on the $9,500 price. As interim financing for this part of the transaction, pending such time as the plaintiff might, if ever, find a cash buyer for the property, the defendants were to "carry the paper". This scheme required the broker to pay the defendants for the "Madison Street property" as follows: His commission on the "Fletcher Road property" of $775 would be the down payment. The broker would pay the balance of $8,725 to the defendants at $57, or more, per month. This monthly payment was to cover the taxes, insurance, interest and principal on the existing loan on the property. It was also to cover a second mortgage at an interest rate of $4\frac{1}{4}\%$ given by the broker to secure the difference between the discount price of the property and its existing mortgage. The second mortgage would yield the defendants $12 per month for the first year, with an additional amount to be paid later. The broker would thus acquire the discounted property by paying the monthly payments on a first mortgage and $12.00 per month at a favorable interest rate on a second mortgage. Under the same proposal, the defendants were to give the plaintiff their note for $400 at 6% interest. This was apparently the method by which the de-

fendants would finance most of the broker's commission on the Trask portion of the proposed exchange. The broker's conservative interest rate did not apply to this phase of the transaction.

On the evening of May 14, 1957, at about 7:00 or 7:30 p.m., the plaintiff came to defendants' residence, bringing with him and submitting to the defendants for the first time the various prepared documents consisting of the exchange contract and supplement; earnest money receipt and supplement, and an analysis of the two alternate proposals outlined above. This conference lasted until midnight.

It is the plaintiff's contention that the defendants voluntarily agreed to the exchange with the Trasks and then requested the plaintiff to "buy back" the Trask property; that they wrongfully refused to perform the agreements and thereby became obligated for payment of the commissions on both properties in the amount of $1,325, as provided in the quoted clause of the exchange contract.

It is the defendants' position that they did not understand the transactions, and that the broker was guilty of fraud and overreaching. The defendants testified that they became confused and tired and relied on the broker's statements and signed the instruments. They looked the papers over early the next morning and discovered that they would receive little or no cash in the foreseeable future. They immediately attempted to call the plaintiff on the phone, but being unable to reach him went to an attorney. The broker was given notice as soon as defendants' attorney could reach him, which was within a day or two after the papers were signed.

The question for decision is whether the trial

court correctly applied the law in making its findings of facts which underlie the judgment.

■ At the outset, we must bear in mind that where a jury trial is waived, the court's findings, as far as contested questions of fact are concerned, must stand if there is substantial evidence to support them. *Berliner v. Brown, Doria et al and Hill*, 221 Or 475, 351 P2d 692, and cases cited therein. The third finding of fact submitted by the plaintiff and adopted by the trial court was:

"* * * That the defendants are not excused from payment of the broker's commission attendant to the transaction and that the defendants have failed to sustain their burden of proof and the plaintiff did not in any way betray their confidence or attempt to cheat, defraud or overreach the defendants in connection with the exchange transaction."

To this finding the defendants filed timely objections and assign error on appeal.

A careful study of the evidence in this case leads to the conclusion that there is no real conflict regarding the facts, either in the testimony or the written exhibits. The evidence permitted the trial court to find that there was no actual fraud. The real issue is whether, as a matter of law, the trial court correctly applied the burden of proof.

It must be remembered that the defendants' original purpose in attempting to sell their property was to secure cash to take care of other obligations. This was the reason their original listing called for a down payment of at least $3,000. Under the proposed transaction, the defendants would receive nothing in immediate cash. They would have merely a vague oral promise that the broker would make a reasonable

effort at some time in the future to convert the discounted exchange property into cash. Meanwhile, the defendants would assume greater obligations than they had before. These facts are not in dispute.

■ It also must be kept in mind that a real estate broker stands in a fiduciary relationship with his customer or client and is thus bound to protect his clients' interests. He must, therefore, make a full, fair and understandable explanation to the client before having him sign any contracts, particularly when those contracts are with the broker himself. *Sexton v. Kelly,* 185 Or 1, 9, 200 P2d 950; 12 CJS, Brokers 96, § 41; 8 Am Jur, Brokers 1035, § 86.

■ The broker should make his explanation commensurate with the education and understanding of the people he is dealing with, and if he is unable to give competent advice he should allow them to obtain it elsewhere. *Reese v. Harper,* 8 Utah2d 119, 329 P2d 410.

Mrs. Gooden, one of the defendants, after testifying at length of their failure to understand the documents, testified as follows:

"* * * He explained that it was a very good deal the way he had figured it out for us, he had taken a lot of time, had had a great deal of experience and had made so many arrangements for people in this town and other places like that, that he could really see through things where people who hadn't had that much experience couldn't. So he had figured this all out to our good. And he told us it was a honey of a deal for us, that we were making a huge mistake if we didn't go ahead and sign these papers * * * .

"* * * * *

"* * * He told us at the time he was out there with those papers, and we were rather reluctant to sign them and asked him if we couldn't

show those to an attorney—that we would like .to have an attorney look them over. And he explained that that wasn't necessary, that he had had so much experience and he had all those figured out to our best advantage, and that it would just be to our expense to call an attorney on it, * * * and that it was foolish to even go to an attorney with the papers."

Mr. Gooden, the other defendant, also testified in regard to advice as follows:

"* * * And we wanted to see an attorney, but he said, 'Oh, that's not necessary—I've fixed up a lot of papers and in fact, these papers the ordinary attorney wouldn't understand.' "

The plaintiff, on being recalled, testified on direct examination as follows:

"Q. Have you any recollection as to the conversation with the Goodens relative to attorneys, them wanting to consult an attorney?

"A. Yes. My memory is that—in explaining the agreements, it's quite customary for folks to suggest they might want an attorney to see them, and I explained to them only this—that my method of arranging trades, whereby I was buying back, was quite complicated to the point of where if it was read by an attorney, it would take a little study to see what I was driving at and attain the aims."

This reluctance to give the defendants a few hours in which to consult an attorney indicates whose interests were uppermost in the plaintiff's mind when he obtained his clients' signatures. The plaintiff's own testimony proved conclusively that the transaction was so complicated that he owed the highest duty to fairly explain the transaction to the defendants who employed him. He thus brought himself under

the rule set forth in Restatement, 2 Agency 2d, 208, § 390:

"An agent who, to the knowledge of the principal, acts on his own account in a transaction in which he is employed has a duty to deal fairly with the principal and to disclose to him all facts which the agent knows or should know would reasonably affect the principal's judgment, unless the principal has manifested that he knows such facts or that he does not care to know them.

"* * * * *

"[Comment g.] * * * The burden of proof is on the agent to show that he has satisfied all the duties required by the rules stated in this Section."

While the trial judge found that the plaintiff did not defraud the defendants, that fact would not be decisive unless fraud was the only issue in the case. The defendants also relied upon the breach of a fiduciary relationship as a defense.

In this action upon an agreement, reduced to writing and signed by the defendants, the evidence is clear that they were laboring under a mistake. The defendants sought to excuse their mistake on the ground that it was induced by the self-serving acts of the plaintiff. The trial court held that their mistake was unilateral and unexcused. The trial court was no doubt led to this conclusion by placing the burden of proof on the defendants. Burden of proof becomes important when we turn our attention from the allegation of fraud to the allegation that the plaintiff breached a fiduciary duty.

■ Conduct by a fiduciary may fall short of fraud and yet amount to a breach of duty to his client. Such a violation of the duty of good faith has been held to be a complete defense in similar cases else-

where. In *Reese v. Harper,* supra, 8 Utah 2d at 122, 329 P2d at 412, the court said:

"Because of the specialized service the real estate broker offers in acting as an agent for his client there arises a fiduciary relationship between them [citing cases]; it is incumbent upon him to apply his abilities and knowledge to the advantage of the man he serves; and to make full disclosure of all facts which his principal should know in transacting the business [citing cases]. Failure to discharge such duty with reasonable diligence and care precludes his recovery for the service he purports to be rendering."

The Utah court, in the case just quoted, also cited with approval the following statement by the Supreme Court of Virginia:

" 'Under these circumstances it was the duty of the agent to disclose to his principal the vital differences in the terms * * *. This duty was not discharged by simply handing to the owner an unsigned contract * * *. It was his duty to inform his principal of all facts which might influence his principal in accepting or rejecting the offer. An agent is not entitled to recover until he has fully performed this duty * * *'." 8 Utah 2d at 123, quoting from *Duncan v. Barbour,* 188 Va 53, 62, 49 SE2d 260, 265.

Also see *Melgreen et ux v. McGuire, Inc. et al,* 214 Or 128, 137, 327 P2d 1114; *Burgess v. Charles A. Wing Agency,* 139 Or 614, 11 P2d 811.

■ Applying the rule quoted from the Restatement of Agency 2d, supra, we find that the plaintiff broker had the burden of proof that he had faithfully performed the duty imposed upon him by law. While the trial court correctly placed the burden on the defendants to prove fraud, it erred in placing the burden on the defendants to prove the plaintiff's

breach of his fiduciary duties to his clients. This error goes to the essence of the findings of fact upon which judgment was entered, and requires reversal.

In an action at law, an error of law of the kind which occurred here can be remedied only by another trial.

Reversed and remanded.