Argued and submitted March 5, affirmed July 31, 1979

# SAGA ENTERPRISES, INC., *Appellant,*
### *v.*
# COLDWELL, BANKER AND COMPANY,
### *Respondents.*

## (No. 413 360, SC 25184)

598 P2d 285

Robert C. Shoemaker, Portland, argued the cause for appellant. With him on the briefs were James N. Gardner, and Lindsay, Nahstoll, Hart, Neil & Weigler, Portland.

Robert S. Ball, Portland, argued the cause for respondents. With him on the brief were Ball, Smith & Orchard, P.C., Portland.

HOWELL, J.

## HOWELL, J.

Plaintiff brought this action for "misrepresentation, concealment of pertinent facts and breach of fiduciary duty" arising out of a real estate transaction in which defendants allegedly represented plaintiff. The trial court, sitting without a jury, found for defendant, and plaintiff appeals.

Plaintiff Saga Enterprises ("Saga") is a California corporation that operates, through a wholly owned subsidiary, Botello Enterprises, a chain of restaurants known as "The Velvet Turtle." Defendant Coldwell, Banker and Company ("Coldwell") is a California corporation licensed to do business in Oregon as a real estate agency. The representatives of these various entities during the transactions that form the basis of plaintiff's complaint were: Walter Botello ("Botello"), chief executive officer of Botello Enterprises; defendant Glenn R. Triplett ("Triplett"), a real estate agent employed by Coldwell; and Richard Quistgard ("Quistgard") who was in charge of property development for Saga.

In October of 1972, Botello Enterprises decided to open a Velvet Turtle restaurant in the Portland area. Botello contacted the Portland office of Coldwell and asked for assistance in finding a site for the restaurant. Coldwell agreed to provide the requested assistance and proceeded to show Botello a number of potential sites. In his inspection of the sites, Botello was accompanied by Triplett.

Botello ultimately selected a site near the Cedar Hills Shopping Center in Washington county. The site was owned by a partnership consisting of Wayne Rembold and Robert Oringdulph, doing business under the name "Conde." Botello Enterprises's normal procedure at this time was not to purchase the property outright, but to engage an independent developer who would purchase the property, construct a restaurant on it to Botello's specifications, and then lease the

[171]

restaurant to Botello Enterprises. Accordingly, Botello requested that Triplett locate a developer for this purpose.

Triplett then contacted Iron Mountain Investment Company ("Iron Mountain"), a partnership consisting of James Praggastis and David Alexander. Iron Mountain indicated an interest in serving as developer and lessor for Botello and proceeded to take the steps necessary to accomplish this.

On April 16, 1973, Iron Mountain and Conde entered into an earnest money agreement for purchase of the property by Iron Mountain. Iron Mountain's obligation to purchase the property was expressly made "contingent upon the following:"

"(12) Purchaser shall have thirty (30) days following Seller's ratification of this Earnest Money Agreement within which to enter into a lease wherein Purchaser is the Lessor, said lease to be on terms and conditions satisfactory to the Purchaser. Purchaser shall notify the escrow and the Seller within said time limit as to whether or not said lease has been entered into.

"(13) Purchaser shall have sixty (60) days following Seller's ratification of this Earnest Money Agreement within which to obtain approval from the appropriate planning and building agencies for approval of the zoning and site layout so as to obtain the necessary building permits to build on the subject property. Purchaser agrees not to submit for building permits and plan approvals until he has waived contingency (12)*"

The agreement provided that if either of the above contingencies were not resolved to the satisfaction of the purchaser (Iron Mountain), the agreement would become void, and the purchaser would be entitled to a refund of the earnest money.

On June 14, 1973, Iron Mountain and Botello Enterprises entered into a "Building Lease" whereby Iron Mountain agreed to build a Velvet Turtle restaurant on the subject property and Botello Enterprises

agreed to lease the same from Iron Mountain. The lease agreement was contingent upon Iron Mountain obtaining a satisfactory building permit and upon Botello Enterprises submitting building plans suitable to Iron Mountain. The parties also agreed that the contract would be binding on Iron Mountain only in the event that Saga guaranteed Botello Enterprises's obligation under the lease.

On June 29, 1973, Iron Mountain had yet to obtain the necessary building permits. It therefore re-negotiated the contract with Conde for purchase of the property. The new contract provided that Iron Mountain could forfeit the $3,000 it had paid in earnest money as an alternative to performance. The contract gave Iron Mountain until no later than September 20 to secure the necessary permits.

Some time in September, Saga decided for internal corporate reasons to purchase the property outright and to assume direct responsibility for constructing the restaurant. Saga therefore shifted responsibility for developing the restaurant from Botello Enterprises to itself. On September 13, 1973, Saga sent Quistgard to Portland to negotiate the change in the transaction.

Upon arriving in Portland, Quistgard met with Triplett and Carl Anderson, another Coldwell agent. At this meeting, Triplett expressed concern over the change in the nature of the transaction, since it would result in a lower commission for Coldwell. Quistgard said that he understood this concern and that Saga was prepared to compensate both Iron Mountain and Coldwell for the time and trouble both had expended in negotiating the lease. Quistgard proposed that Saga pay Coldwell $5,000 for services rendered and that Saga pay Iron Mountain $10,000 above Iron Mountain's cost of purchasing the property from Conde.

The discussion then turned to what Quistgard term-ed "contingencies and the time factor":

"We then talked about two other matters, the contingencies and the time factor. Mr. Triplett indi-

[173]

cated that time was of essence here because evidently the contract that existed at the time between Rembold and Iron Mountain had some time problems on it and that I was led to believe that Mr. Rembold was either going to sell it to somebody else or develop an office building or something if this transaction didn't culminate rather soon."

"We then talked about contingencies relating to building permits and liquor licenses and those kind of things, and Triplett indicated that they were not available. We could not have any contingencies or any way of getting out of the contract because Iron Mountain didn't have any of those kind of things. There wasn't any way that we could have anything other than what the contract might say between Iron Mountain and Rembold.

"We discussed this at some length because we had not departed from the usual practice of always having the contingencies in there. I was concerned about the time factor both from our standpoint as well as the time factor that Mr. Triplett indicated was there between the seller and the proposed developer. We talked at length about the contingencies and the necessity of having to have them, and the gist of the conversation was such that I was told there wasn't any possible way that we could have any kind of a contingency or out-clause to speak of because the proposed seller -- at that point Iron Mountain -- did not have them to pass onto us."

Quistgard then decided to proceed without any "contingencies" and signed an earnest money agreement by which Saga offered to purchase the property from Iron Mountain unconditionally. The earnest money agreement did not give Saga the option of forfeiting the earnest money as an alternative to performance as did the earnest money agreement between Iron Mountain and Conde. On September 13, Iron Mountain accepted Saga's offer.

On September 14, Iron Mountain and Conde negotiated a new contract for the purchase of the property by Iron Mountain, since the contract of June 29 was about to expire. The September 14 agreement

included terms that were essentially the same as the June 29 agreement, including the provision for forfeiture of the earnest money as an alternative to performance.

On October 31, Iron Mountain and Conde again negotiated a new contract, but unlike the previous contracts, this one did not contain a provision allowing Iron Mountain to forfeit its earnest money as an alternative to performance. Instead, Iron Mountain agreed to be absolutely bound to purchase the property.

About this time, Saga was beginning to experience difficulty in obtaining the liquor license it needed to operate its restaurant. By December, Quistgard decided a license could not be obtained, and Saga abandoned its effort to obtain one. On December 6, 1973, Quistgard wrote to Iron Mountain, requesting that the earnest money agreement be canceled and that Saga's $5,000 earnest money be refunded.

Iron Mountain refused to rescind the agreement and brought a declaratory judgment suit against Saga and Conde. In the suit for declaratory relief, Iron Mountain prayed that in the event Conde obtained specific performance against Iron Mountain, Iron Mountain be awarded a decree of specific performance against Saga. After reviewing the facts, Saga decided it would not prevail in the suit, and negotiated settlements of $20,000 with Iron Mountain and $56,762.14 with Conde.

Saga tendered the proposed settlement to Coldwell and offered it the opportunity to either defend the suit on Saga's behalf, negotiate a more favorable settlement, or provide the funds to settle the case on the terms negotiated by Saga, plus payment of Saga's attorney fees and expenses. Coldwell refused the offer, and Saga settled the case.

Saga then brought this action against Coldwell and Triplett. The first paragraph of Saga's complaint stated:

> "This is an action for actual and punitive damages arising from defendants' misrepresentation, concealment of pertinent facts and breach of fiduciary duty while serving as plaintiff's agent."

In essence, Saga's theory was that Triplett misrepresented the willingness of Iron Mountain and Conde to enter into conditional contracts that would have allowed Saga to avoid purchasing the property when it was unable to obtain a liquor license. Saga contends that as a result of this misrepresentation, it entered into a contract unconditionally obligating it to purchase the property, and sustained losses when it did not proceed with the purchase due to its inability to obtain the liquor license. Saga sought to recover the amount it paid in settlement of the Conde and Iron Mountain claims, defense costs, and punitive damages.

The trial court found for defendants on the facts and entered the following conclusion of law:

> "Plaintiff's claim was based upon a theory of fraud, and did not include an independent action for breach of fiduciary duty. Nevertheless, plaintiff failed to sustain its burden of proof that defendants or either of them misrepresented or concealed any pertinent facts in connection with the transaction, thus there was no breach of any fiduciary duties owed by defendant or either of them to plaintiff."

The trial court also stated, in a letter opinion that was incorporated by reference into the findings, that:

> "Viewing all of the pertinent evidence, I find that the evidence does not preponderate, let alone be clear and convincing to the charges of paragraph VII, more specifically, that Conde (the owner) and Iron Mountain (developer-vendee of Conde-vendor to Saga) would agree to forfeiture of the earnest money as the only penalty for non-performance by Saga."

[176]

Plaintiff appeals from the "Findings of Fact, Conclusions of Law and Judgment of the trial court."[1] Plaintiff raises four assignments of error on appeal: (1) the trial court erred "in holding that plaintiff's recovery was barred by plaintiff's agent's lack of due diligence"; (2) the court was "clearly erroneous" in finding that neither Iron Mountain nor Conde would have agreed to include a forfeiture provision in an earnest money agreement with Saga; (3) the court's finding that Iron Mountain would not have agreed to an earnest money forfeiture provision was "irrelevant"; and (4) the court erred "in refusing to consider plaintiff's claim for breach of fiduciary duty."

---

[1] The pertinent portions of the trial court's findings of fact and conclusions of law are as follows:

"FINDINGS OF FACT

"* * * * *.

"IV.

"At all material times, defendant Coldwell, Banker was the agent of plaintiff and of Botello Enterprises, Inc. for the purpose of locating a site for a Velvet Turtle Restaurant, and Coldwell, Banker was also the agent of Iron Mountain Investment Co. Coldwell, Banker's dual agency was known and assented to by all concerned and affected parties, including plaintiff.

"* * * * *.

"VI.

"On September 13, 1973, Richard Quistgard, Vice President of plaintiff, came to Portland, Oregon for the purpose of purchasing the land on behalf of plaintiff for development of the Velvet Turtle Restaurant. After conferring with Mr. Triplett, visiting the site and investigating the likelihood of issuance of zoning approvals, building permits and a liquor license for a restaurant on the site, Mr. Quistgard executed an unconditional earnest money agreement offering to acquire the land from Iron Mountain Investment Co. That offer was made by plaintiff without any misrepresentation or concealment of pertinent facts by the defendants, and Mr. Quistgard acted upon his own investigation and his superior knowledge and experience in handling real estate transactions.

"VII

"The allegations in paragraph VII of plaintiff's third amended complaint are not supported either by clear and convincing evidence or by a preponderance of the evidence.

[177]

## I.

Plaintiff's contention that the court erred in denying plaintiff recovery on the basis of its agent's lack of due diligence is without merit because it misconceives the court's findings of fact. We agree with defendants that the court did *not* hold that plaintiff could not recover because its agent failed to exercise due diligence. The court did make several observations concerning the relative sophistication of Quistgard and Triplett.[2] The ultimate conclusions the court reached,

---

### "VIII.

"Plaintiff's offer was accepted by Iron Mountain Investment Co. Plaintiff later was unsuccessful in securing issuance of a liquor license for a restaurant to be constructed on the property, and refused to perform in accordance with its earnest money agreement obligations. Plaintiff thereafter negotiated a settlement agreement with Iron Mountain Investment Co. and Conde.

"Based on the foregoing findings of fact, the Court makes the following:

### "CONCLUSIONS OF LAW
#### "I.

"Plaintiff's claim was based upon a theory of fraud, and did not include an independent action for breach of fiduciary duty. Nevertheless, plaintiff failed to sustain its burden of proof that defendants or either of them misrepresented or concealed any pertinent facts in connection with the transaction, thus there was no breach of any fiduciary duties owed by defendants or either of them to plaintiff.

" * * * * * "

[2] These observations were included in the letter opinion issued by the trial court:

"In reviewing the events of September 13, 1973, I am called upon to view closely the two principal participants, i.e. Quitsgard and Triplett. The former is a sophisticated person dealing with matters such as were at hand. His position with Saga was in effect general manager of 'acquisitions' and was the person authorized to review the type of 'build to suit lease' initially proposed by Botello. It was in this position that he carried out the new corporate policy—a shift from 'build to suit lease' to 'build ourselves—purchase whenever we can,' and at this point he became the principal agent for Saga, which was no longer willing to guarantee the Botello type arrangement.

however, were that plaintiff failed to show that Iron Mountain and Conde would have agreed to include a forfeiture provision in an earnest money agreement with Saga and that plaintiff failed to show that defendants misrepresented or concealed any pertinent facts. At no time did the trial court suggest that but for plaintiff's agent's lack of due diligence, plaintiff would have been entitled to recovery.

## II.

Plaintiff's second and third assignments of error can be considered together. Both relate to the trial court's conclusion that the evidence did not show Iron Mountain or Conde would have agreed to forfeiture of earnest money as an alternative to performance in a contract with Saga. Plaintiff contends these findings are "clearly erroneous" and that the finding as to Iron Mountain was "irrelevant," because plaintiff could simply have eliminated Iron Mountain from the transaction and dealt directly with Conde.

"Triplett was a relative newcomer to the field, having joined Coldwell-Banker in January, 1973. His prior experience since college graduation in 1966 was with Consolidated Freight and Xerox, apparently not related to the real estate industry. He was and is a licensed real estate salesman, and during the period in question was under the direct supervision of the Portland manager and vice president of Coldwell-Banker, Dutcher.

"It is obvious, that of the two, Quistgard was the more experienced and talented when it came to the type of transaction involved. Viewing all of the pertinent evidence, I find that the evidence does not preponderate, let alone be clear and convincing to the charges of paragraph VII, more specifically, that Conde (the owner) and Iron Mountain (developer - vendee of Conde - vendor to Saga) would agree to forfeiture of the earnest money as the only penalty for non-performance by Saga.

"Quitsgard went ahead knowing the perils, had no clear assurance of obtaining the necessary permits, particularly the liquor license, did not obtain local counsel, did not insist on negotiating directly with the vendors, and made no contemporaneous memoranda bearing on the pertinent issue. Furthermore, while he felt that Coldwell-Banker was working for Saga, he knew the commission on his purchase was being paid by Iron Mountain. For all of these reasons, I conclude that plaintiff is not entitled to recover, because Triplett neither misrepresented nor concealed the pertinent matters."

■ We note initially that in reviewing the trial court's findings of fact, the test we apply is not whether the trial court's findings were "clearly erroneous," but whether they are supported by any evidence. *Hendrix v. McKee,* 281 Or 123, 575 P2d 134 (1977); ORS 17.435. Under the "any evidence" test, we cannot set aside a factual finding unless we can affirmatively say there is no evidence to support it.

■ On the record before us in the present case, we have no difficulty upholding the trial court's finding as to Iron Mountain's unwillingness to include a forfeiture provision[3] in its contract with Saga. James Praggastis, one of the two partners in Iron Mountain, testified unequivocally at trial that Iron Mountain would not have agreed to a liquidated damage provision as its only remedy for Saga's default. Plaintiff claims Praggastis's position was unreasonable and should not have been believed by the trial court, but the trial court was entitled to believe that Iron Mountain would have taken that position whether it was reasonable or not.

The trial court's conclusion as to Conde's willingness to include a forfeiture provision in a contract with Saga is more problematic. The evidence showed that at the time of the September 13 meeting between Quistgard and Triplett, the Conde-Iron Mountain contract had one week to run. The evidence also showed that, at that time, the contract that existed between Conde and Iron Mountain included a forfeiture provision identical to the one Saga claims it could have obtained. Finally, the evidence showed that Conde signed an identical agreement with Iron Mountain a few days after the September 13 meeting.

Plaintiff argues that in light of this evidence the trial court should have concluded that Conde would have been willing to contract directly with Saga and

---

[3] As used in this opinion, "forfeiture provision" means a provision allowing the purchaser to forfeit earnest money paid as an alternative to performance.

[180]

that Conde would have agreed to include in the contract a liquidated damages provision as its only remedy for Saga's default. The question before us is whether we can say that the trial court's conclusion has any support in the record. We find that there is ample support.

We first note that the trial court did not actually find that Conde would not have agreed to include a forfeiture provision in its contract with Saga. What the court found was that "[t]he evidence does not preponderate * * * that Conde * * * would agree to forfeiture of the earnest money as the only penalty for non-performance by Saga." The question for us to decide, therefore, is whether the evidence was such that the trial court was required, as a matter of law, to find that plaintiff satisfied its burden of proof on this issue.

Although the evidence did show that Conde was willing to agree to a forfeiture provision *in its contract with Iron Mountain,* we do not think this evidence, standing alone, *required* the trial court to conclude that Conde would have agreed to the same type of provision *in a separate and independent contract with Saga.* A party's dealings in contracting with one party may be probative evidence of its willingness to deal with another party on similar terms, but those dealings are not conclusive evidence of such willingness.

Even more important is the fact that in the present case, Wayne Rembold, a partner in Conde, testified at trial but was never asked whether he would have agreed to include a forfeiture provision in a contract with Saga. His only testimony was that in August and September, he was considering termination of Conde's contract with Iron Mountain and assuming Iron Mountain's role as developer of the property. He did not testify that he would have agreed to sell the property outright to Saga under terms allowing Saga to avoid performance upon forfeiture of earnest money. Under these circumstances, we think

the trial court could properly conclude that plaintiff had not carried its burden of proof on this issue.

Plaintiff's third assignment of error is that the trial court's finding that Iron Mountain would not have agreed to inclusion of a liquidated damages provision in its contract with Saga was "irrelevant." This contention is premised upon the assumption that Saga could have eliminated Iron Mountain and dealt directly with Conde, thereby obtaining a liquidated damages provision. Our previous finding that the trial court was justified in concluding that plaintiff did not prove such a provision would have been forthcoming from Conde renders this argument meritless.

### III.

■ Plaintiff's final assignment of error is that the court erred "in refusing to consider plaintiff's claim for breach of fiduciary duty." Saga contends that a fiduciary relationship arose when Coldwell agreed to assist Botello Enterprises in locating a suitable restaurant site, and that Coldwell's obligations under that relationship were transferred to Saga when Saga assumed responsibility for the project. Coldwell, on the other hand, while conceding that it was an agent of Botello Enterprises in connection with the lease transaction, denies that the agency continued when Saga entered the transaction. We have reviewed the record and agree with the conclusion reached by the trial court that Coldwell acted as an agent for Saga as well as Botello Enterprises. Both Quistgard and Robert Dutcher, the manager of Coldwell's Portland office, testified that they understood Coldwell to be representing Saga as well as Botello Enterprises throughout the transaction. Agency is a consensual relationship, and the fact that Saga changed the nature of the transaction in September of 1973 did not terminate the agency unless that was the understanding of the parties.

We agree with defendants, however, that it is clear from a reading of the trial court's written findings that

the court in fact did consider plaintiff's claim for breach of fiduciary duty. The trial court specifically found that "there was no breach of any fiduciary duties owed by defendants or either of them to plaintiff."

In response, plaintiff notes that if the trial court did consider the breach of fiduciary duty claim, the court nevertheless "did not heed the most important consequence of the breach of fiduciary duty claim — it did not place the burden of proving full disclosure on the defendants."[4] Plaintiff relies on *Starkweather v. Shaffer,* 262 Or 198, 497 P2d 358 (1972); *Widing et al v. Jensen, Real Estate Com.,* 231 Or 541, 373 P2d 661 (1962); *Prall v. Gooden,* 226 Or 554, 360 P2d 759 (1961); and *Parker v. Faust,* 222 Or 526, 353 P2d 550 (1960), for the proposition that in an action where a fiduciary relationship is shown to exist, the burden of proving complete disclosure of material facts is on the fiduciary.

This court has recognized the existence of a cause of action in tort by a client against a real estate broker when the broker misrepresents or fails to disclose pertinent facts in connection with a real estate transaction. *Starkweather v. Shaffer, supra.* In *Starkweather,* a client brought an action for damages against a real estate broker who had purchased the client's property and resold it for over twice what he paid the client. In affirming a judgment for the client, we said that because the real estate broker is a fiduciary of his client

'[h]e must make a full and understandable explanation to the client before having him sign any contracts, particularly when the contracts are with the broker himself. * * * The relationship casts upon

---

[4] At oral argument, defendants suggested "in passing" that plaintiff's assignment of error did not properly raise this issue because plaintiff did not actually assign as error the court's misallocation of the burden of proof. We agree that the manner in which the assignment is framed leaves much to be desired, but because of our disposition of this case, we need not consider any technical defects in the assignment.

the broker the burden of showing that there was a full and complete disclosure and that the broker did not reap a secret profit." 262 Or at 203.

Plaintiff relies on this language as authority for its argument that the trial court erred in not placing the burden of proving full disclosure on defendants.

Assuming, arguendo, that the court should have placed the burden *of proving full disclosure* in this case on defendants,[5] it does not follow that the defendants also had the burden of proof with respect to *all* the other elements of the cause of action. Because this is a tort action, the plaintiff had the burden of proving that the activity complained of caused it some damage. The fact that an act is wrongful, by itself, does not entitle a plaintiff to recovery unless the plaintiff can· also show that the wrongful conduct caused the plaintiff some legally cognizable damage. Restatement (Second) of Torts, §9, comment a (1965). *Cf., Brennan v. City of Eugene,* 285 Or 401, 405, 591 P2d 719 (1979). To paraphrase Pollock, "Proof of breach of fiduciary duty in the air, so to speak, will not do." F. Pollock, The Law of Torts 472 (10th ed 1916).

The cases on which plaintiff relies, including *Starkweather,* indicate that when a client challenges the activities of a broker in litigation, the broker has the burden of proving that he satisfied his fiduciary obligations to the client and that he disclosed any profit he made that was not otherwise known to the client. The cases do not require the broker to also demonstrate that the price the client paid or received for the property was equal to the fair market value. On the contrary, we held in *Becker v. Capwell,* 270 Or 200, 527 P2d 120 (1974), that in an action by a client

---

[5] Plaintiff relies primarily upon cases involving contracts between real estate brokers and their clients. Rules established in those cases may or may not provide authority to govern other actions by clients against their brokers. Rather than relying on general statements concerning fiduciary obligation in cases that involve entirely different facts, it would be more productive for parties to examine the nature of the relationship at issue in developing the theory of their cases.

against a real estate broker arising out of the broker's failure to disclose that he was the owner of property purchased by the client, the burden was on the client to prove that he suffered a loss on the transaction.[6]

■ We think that in an action such as this, as in any tort action, the burden of proving causation and damage should be placed on the plaintiff, as the party seeking to alter the status quo. Accordingly, we hold that in a tort action by a client against his broker for breach of fiduciary duty, the burden is on the client to prove that he was damaged by the alleged breach, regardless of who has the burden of proving that the breach did or did not occur. *Becker v. Capwell, supra.*

■ In the present case, plaintiff's theory of recovery can be summarized by reference to the following statement in its reply brief:

> "* * * [T]he defendant Glen Triplett failed to reveal a material fact — that the Iron Mountain/-Conde agreement did in fact contain a liquidated damages provision. * * * *If Quistgard had been informed of the true state of affairs, he could and would have bargained for a 'symmetrical' provision in Saga's contract with Iron Mountain. Alternately, he could simply have* refused to deal with Iron Mountain, waited one week until the earnest money agreement between Conde and Iron Mountain expired, and then *signed an agreement containing a liquidated damages clause directly with Conde."* (Emphasis added.)

---

[6] At oral argument, plaintiff cited *Widing et al v. Jensen, Real Estate Com.,* 231 Or 541, 551, 373 P2d 661 (1962), for the proposition that a real estate agent should not be heard to argue that his breach of fiduciary duty did not injure the client. *Widing,* however, was not an action for damages by the client, but a disciplinary proceeding against the agent. The statute in that case, ORS 696.300(1)(q) (now codified as ORS 696.301(32)), provided for license suspension or revocation for "dishonest, fraudulent or improper dealings." It did not require damage to the client. In contrast, it is well settled that in a tort action, with a few limited exceptions, there can be no recovery unless the conduct of the defendant causes plaintiff some injury. *See generally,* W. Prosser, Law of Torts 28-30 (4th ed 1971); *see also id.* at 731-32 (discussing this rule in the context of the tort of misrepresentation.)

As can be seen, plaintiff's position is not that it was damaged by its purchase of the property per se, but rather that it was damaged by its failure to purchase the property on better terms than it was able to negotiate. Accordingly, plaintiff's proof that it was damaged by Triplett's "misrepresentation and concealment of pertinent facts" is sufficient only if it showed that but for the misrepresentation plaintiff "could and would have bargained for a 'symmetrical' [liquidated damages] provision in Saga's contract with Iron Mountain [ or in a similar contract between Saga and Conde]." As previously indicated, however, the trial court specifically found that plaintiff had not proved such a provision could have been obtained from Iron Mountain or Conde. On the record before it, the trial court was justified in making that finding for the reasons stated above.

Because plaintiff's proof failed with respect to an essential element of its cause of action, the element of causation, any error by the trial court in placing the burden on plaintiff to prove defendants' breach of fiduciary duty could not have been prejudicial. Plaintiff's failure to prove causation was sufficient by itself to justify the judgment for defendant.

Affirmed.