Argued and submitted March 2, reversed in part, affirmed in part July 11, reconsideration denied August 31, petition for review allowed October 16, 1984 (298 Or 68)
See 298 Or 318, 693 P2d 20 (1984)

LINDLAND et al,
*Respondents,*

*v.*

UNITED BUSINESS INVESTMENTS,
INC., dba International Business Associates,
*Appellant.*

(A8012-07103; CA A26549)

684 P2d 614

Lee M. Hess, Portland, argued the cause for appellant. With him on the briefs were Swire, Riebe & Hess, Portland.

David N. Goulder, Portland, argued the cause for respondents. With him on the brief were Robert B. Hopkins, Randall L. Dunn and Keane, Copeland, Landye, Bennett and Wolf, Portland.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

WARDEN, J.

## WARDEN, J.

This is an action in tort for damages claimed to have resulted from breach of the fiduciary duty of a broker, defendant United Business Investments, Inc. (UBI), in the sale of plaintiffs' business. UBI appeals from the judgment of $249,431.72 for plaintiffs entered after a jury trial. The judgment included six categories of damages, including $50,000 for impairment of credit. We reverse the award for impairment of credit and otherwise affirm.

We view the facts in the light most favorable to plaintiffs. In March, 1980, plaintiffs entered into a listing agreement with UBI for the sale of their corporate business, Royal Chemical Company, dba The Minkler Company (Minkler). Before plaintiffs agreed to the listing agreement, Hetu, a UBI employe, told them that UBI would evaluate potential buyers to assure that they were financially qualified and capable of managing Minkler. Hetu also gave plaintiffs a brochure that stated that UBI would select only qualified buyers and would recommend against a sale if it appeared to be disadvantageous to the continued success of the business. Plaintiff Conrey testified that plaintiffs relied on those representations in deciding to list the business with UBI.

UBI subsequently introduced Bales and McLeod to plaintiffs as potential buyers. After reviewing Bales' and McLeod's financial statements, which were provided by UBI, plaintiffs expressed concern to UBI about the buyers' financial liquidity. UBI salesman Schalles then assured them that Bales and McLeod had $60,000 from a sale of stock that was not listed on the financial statements and an additional $250,000 cash available.

On May 28, 1980, plaintiffs sold all their stock in the corporation to Basic Resources, a corporation newly formed by Bales and McLeod. The sale was consummated by a stock purchase agreement, signed by Bales and McLeod as guarantors, which provided for a down payment of $60,000 and a balance of $150,000 payable in 120 equal monthly installments, plus interest at 12 percent per annum. Basic Resources also agreed to assume plaintiffs' contract obligations to the former owners of Minkler and various other liabilities. UBI received a brokerage commission of $17,850 from the down payment.

Within a few months, Basic Resources, Bales and McLeod defaulted on their payment obligations to plaintiffs and on the other liabilities they had assumed under the stock purchase agreement. By September, 1980, the company was insolvent and its assets were turned over to The Oregon Bank, which had provided it a line of credit secured by its assets. Following that default, plaintiffs learned that Bales and McLeod had not had the $250,000 cash available or the $60,000 for the down payment and that the down payment had been provided by a third party, Binford, to whom Bales and McLeod had granted an interest in and substantial control over Minkler.

At trial, there was evidence that Binford had discussed the Minkler stock sale with Schalles before the May 28 closing date, that on May 9 a $10,000 check with Binford's name typed on its face was delivered to Schalles to redeem the earnest money note and that on May 23 a $50,000 cashier's check provided by Binford for the balance of the down payment was delivered to UBI by Binford's accountant. Binford testified that, at the time the Minkler stock sale closed, he had sufficient assets to satisfy Basic Resources' obligations under the stock purchase agreement and that he probably would have guaranteed performance of those obligations.

Plaintiffs testified that, had they known that Bales and McLeod did not have the $60,000 down payment but that it was being provided by Binford, they would not have sold Minkler to Basic Resources without Binford's personal guarantee. They also testified that they did not believe that they would have sold to Basic Resources had they been aware that Bales and McLeod did not have the $250,000 that Schalles had indicated was available to them. In essence, plaintiffs' theory is that UBI breached its fiduciary duty by misrepresenting the financial status of Bales and McLeod and by failing to reveal that Binford was the true source of the down payment, that if plaintiffs had known the true facts, they either would not have sold the company to Basic Resources or would have sold it only with Binford's personal guarantee and that, as a result of UBI's breach, plaintiffs sold the company to Basic Resources and suffered losses when Basic Resources, Bales and McLeod were unable to meet the various financial obligations that they had assumed.

Plaintiffs' alleged losses included: the balance of $145,576.03 on the stock purchase agreement; a loan of $21,818.19 at The Oregon Bank, which Basic Resources had assumed, but on which plaintiffs remained personally liable; the balance of $105,000 on their purchase agreement for Minkler with its previous owner, which Basic Resources had assumed, but on which plaintiffs remained personally liable; attorney fees of $17,037.50 incurred by plaintiffs in defending a lawsuit by their seller; UBI's brokerage commission of $17,850; and damages of $50,000 for impairment of credit. The jury awarded damages of $145,576.03 on the stock purchase agreement, $21,818.19 on the Oregon Bank loan, $15,000 on plaintiffs' purchase agreement, $17,037.50 in attorneys fees, $10,000 for the broker's commission, and $50,000 for impairment of credit.

Defendant posits 23 assignments of error, including challenges to various jury instructions, the admission of certain evidence and the denial of its motions for a directed verdict, to strike certain allegations and for judgment notwithstanding the verdict or, in the alternative, a new trial. We have examined each assignment and have determined that only three of the issues raised merit discussion: (1) whether the burden of proving full disclosure was properly placed on defendant; (2) whether plaintiffs' claim for impairment of credit was properly submitted to the jury; and (3) whether interest from May 28, 1980, until the date of judgment on the award of damages for the unpaid balance of the stock purchase agreement was awarded properly.

■  We first discuss the burden of proving full disclosure. It is well established that a real estate broker stands in a fiduciary relationship with its client and that the broker is obligated to disclose fully all information concerning the prospective sale of the property. *Starkweather v. Shaffer,* 262 Or 198, 497 P2d 358 (1972); *Prall v. Gooden et ux,* 226 Or 554, 360 P2d 759 (1961); *Parker v. Faust,* 222 Or 526, 353 P2d 550 (1960). Oregon courts have repeatedly stated that the fiduciary relationship casts upon the broker the burden of showing that the duty of full disclosure was faithfully performed. *Starkweather v. Shaffer, supra; Prall v. Gooden et ux, supra; Parker v. Faust, supra; see also Gibson Bowles, Inc. v. Montgomery,* 51 Or App 313, 625 P2d 670 (1981). Defendant, however, argues that the only circumstances in which the

Supreme Court has placed that burden on a broker is when the broker was acting for its own account and thus had a conflict of interest. It contends that no such conflict existed here and, pointing to a footnote in *Saga Enterprises, Inc. v. Coldwell, Banker and Co.,* 287 Or 169, 598 P2d 285 (1979), argues that the court has suggested that that rule should not necessarily apply in all situations:

> "Plaintiff relies primarily upon cases involving contracts between real estate brokers and their clients. Rules established in those cases may or may not provide authority to govern other actions by clients against their brokers. Rather than relying on general statements concerning fiduciary obligation in cases that involve entirely different facts, it would be more productive for parties to examine the nature of the relationship at issue in developing the theory of their cases." 287 Or at 184 n 5.

■       *Saga* involved an action by a client seeking to purchase commercial real estate against a broker for alleged breach of its fiduciary duty to disclose certain facts about the prospective seller and the prospective developer of a parcel of real estate. Following a judgment for the broker, the plaintiff appealed, arguing that the trial court " 'did not heed the most important consequence of the breach of fiduciary duty claim— it did not place the burden of full disclosure on the defendants.' " 287 Or at 183. However, because the *Saga* court found that the plaintiff had the burden of proving damages alleged to have been caused by that breach, and that it had failed to carry that burden, the court did not decide whether the burden of proving full disclosure had been allocated properly. The holding of *Saga,* therefore, is not helpful here, and the *dicta* quoted by defendants offers no guidance as to what factual circumstances might require reallocating that burden of proof. Although it may be that the present case differs factually from the cases giving rise to the general rule that places the burden of proving full disclosure on the broker, we believe that the representations made by UBI and upon which plaintiffs relied in listing the business with UBI created the same type of fiduciary relationship as existed in those cases. It is that relationship that puts the burden of proving full disclosure on the broker. *Starkweather v. Shaffer, supra,* 262 Or at 203. We discern no basis here to justify a departure from the general rule. The trial court did not err in that respect.

We next consider defendant's contention that the trial court erred in denying its motion, made at the close of plaintiffs' case, to dismiss plaintiffs' claim for $50,000 damages for impairment of credit. ORCP 54B(2). The evidence established that plaintiffs had more difficulty in obtaining credit after the failure of Minkler, but there was no evidence of any resultant monetary loss. Defendant argues that there is insufficient evidence of a causal relationship between the alleged breach of fiduciary duty and plaintiffs' restricted credit and that, even if there is sufficient evidence of causation, the award was improper because of the lack of evidence by which the jury could properly measure damages. In response, plaintiffs contend that the damages arose "naturally and necessarily" from the breach and that the award is therefore sustainable as an award of general damages without proof of extent of monetary loss.

■ ■ We need not decide whether there was sufficient causal connection, because we hold that plaintiffs were required to prove the extent of their loss and that their failure to do so requires reversal of the award for impairment of credit. Although absolute certainty in proving the amount of damages is not required, when the amount of damages is susceptible of proof such proof must be offered. *Austin v. Bloch,* 165 Or 116, 105 P2d 868 (1940). Unlike general damages, such as for pain and suffering, which are not subject to mathematical computations, the damages plaintiffs claim here are susceptible of proof with a reasonable degree of certainty. For example, plaintiffs could have attempted to show that because they were denied credit they lost certain profits due to reduced inventory or services. Assuming that credit was obtainable at a higher rate, they could have shown the increased expense due to the difference in interest rates. Because plaintiffs offered no evidence from which the jury could determine their damages, it was impermissible to permit the jury to speculate as to the extent of those damages. Accordingly, the award of $50,000 for impairment of credit is reversed.

We now consider the issue of the trial court's award of interest on the damages awarded plaintiffs for the balance due on the stock purchase agreement with Basic Resources. By special interrogatory, the jury found the unpaid principal balance of that agreement to be $145,576.03. The trial court

calculated interest on that amount at 12 percent from May 28, 1980 (the closing date of the sale) to the date of judgment and awarded $41,111.74.

Relying on *Calcagno v. Holcomb,* 181 Or 603, 613-14, 185 P2d 251 (1947), defendants contend that, although they had stipulated that the court, rather than the jury, could calculate interest if it were allowable, the court erred in awarding interest, because prejudgment interest is not allowable on unliquidated damages in a tort case. Alternatively, they argue that, even if prejudgment interest is allowable, it may not exceed the statutory rate of 9 percent. *See* ORS 82.010(3).

■ We conclude that the interest awarded should not be characterized as prejudgment interest and that it was properly awarded. The stock purchase agreement between plaintiffs and Basic Resources provided for interest on the unpaid balance of that contract at 12 percent per annum. Although the amount of principal owed to plaintiffs by Basic Resources was not determined until the jury rendered its verdict, plaintiffs' entitlement to interest at 12 percent on the principal sum was already established by the contract terms. The trial court's award of interest was merely a determination of the dollar amount of interest necessary to compensate plaintiffs fully under the jury verdict. The trial court did not err in awarding interest at 12 percent on the principal amount determined by the jury.

The award of $50,000 for impairment of credit is reversed; in all other respects the judgment is affirmed.