# GILLEY COMPANY,
## *Respondent,*
*v.*
# MUTUAL WHOLESALE DRUG COMPANY,
## *Appellant.*

## (No. 7910-05094, CA 19233)

650 P2d 956

Gary V. Abbott, Portland, argued the cause for appellant. With him on the briefs was Wolf, Griffith, Bittner, Abbott & Roberts, Portland.

Curtis W. Cutsforth, Portland, argued the cause for respondent. With him on the brief were James N. Westwood, Miller, Nash, Yerke, Wiener & Hager, Portland, and John H. Holmes, Lee S. Aronson and Jensen, DeFrancq, Holmes & Schulte, Portland.

Before Gillette, Presiding Judge, Joseph, Chief Judge, and Young, Judge.

GILLETTE, P. J.

## GILLETTE, P. J.

This was an action for a real estate commission. Defendant, Mutual Wholesale Drug Company (Mutual), appeals from a jury verdict in favor of plaintiff, The Gilley Company (Gilley). Mutual argues that the trial court erred by striking all of its affirmative defenses and several of its counterclaims and by granting Gilley a directed verdict on the counterclaims. We reverse.

In 1977, Mutual asked Charles Cota, a senior vice president of Gilley, to find a lessee for a portion of a warehouse Mutual owned in Portland. One Smith, a Gilley broker, arranged for the lease of the warehouse to the American Red Cross. The lease between Mutual and the Red Cross, executed in 1978, provided that, if Mutual decided to sell the building "on other than a sale/leaseback basis," Red Cross was to have "first right of refusal to purchase said property at the same price and terms as those acceptable to [Mutual] from any other purchaser * * *."

In 1979, financial difficulties forced Mutual to sell the warehouse. On May 7, 1979, it entered into a listing agreement with Gilley through Cota. A fee addendum, incorporated into the agreement, obligated Mutual to pay on sale the fee it owed Gilley for obtaining the Red Cross lease. The addendum stated: "The Gilley Company represented both parties to this lease." Cota recommended that the price for the warehouse be set at $1,400,000. He testified that he was aware that, because of Mutual's financial difficulties, the warehouse needed to be sold quickly. Krigbaum testified that Cota indicated he knew that the property had to be sold by June 1, 1979, and that a $100,000 down payment was required.

After obtaining the listing on the property, Cota notified May, another Gilley broker, that the building was for sale. May told Tall, a potential buyer, about it. On May 12, 1979, Cota and May took Tall to see the warehouse and Tall expressed an interest in purchasing it. Tall testified that he told Cota and May of his intent to circumvent the Red Cross' first right of refusal on the property by framing his offer in terms of a sale and leaseback. He testified further that Cota told him that doing so would not totally prevent the Red Cross from exercising that right. Tall also

told Cota that his offer would be conditioned upon successfully arranging a property management contract with Gilley.

On May 15, 1979, Tall delivered to May a proposed contract that offered $1,225,000 for the property. May and Cota met to discuss the offer early that morning. Without consulting with his client, Mutual, Cota advised May that the amount offered was not acceptable and that $1,250,000 was the absolute minimum offer that Mutual would consider. Cota also said that the property mangement agreement contingency would not be acceptable to Mutual. May conveyed Cota's remarks to Tall, who agreed to increase his offer to $1,250,000. Tall also agreed to the omission of the property management contingency from the contract, after May assured him that Gilley would manage the property, anyway.

Cota and May presented the modified proposed contract to Mutual's representative, Krigbaum, on the afternoon of May 15. The contract contained a selling price of $1,250,000, which was below the listing price. The property management contingency had been removed. In other provisions, Mutual was required to pay all closing costs, and the Red Cross' right of first refusal was not mentioned. Cota and May both testified that they had pointed out to Krigbaum that the offering price was different from the listing price and that the property management contingency originally proposed by Tall had been removed. Both further testified that they had told Krigbaum that Gilley had entered into the collateral management agreement. Krigbaum testified that he had noticed the property management contingency had been striken from the agreement, but he claimed he had not been advised that Gilley had in fact agreed to manage the property.

Cota also testified that he had not noticed that the agreement required Mutual to pay all the costs and that, if he had, he would have brought that fact to Krigbaum's attention. Krigbaum admitted that he probably had noted the closing costs term, but he testified that he did not know what closing costs were in a commerical context or how those costs were usually divided.

Krigbaum asked Cota what he thought of the Tall proposal and Cota advised that it looked like a good, "clean" deal. Initially, Krigbaum indicated that he would ask his attorney to review the contract, and Cota and May did not object. After a minute or two, Krigbaum said, "Oh, the heck with it," and signed the contract.

On the same day, May 15, Ronald Parr, a broker representing the McKenzie Company, another potential buyer, was trying to reach Cota to present an earnest money agreement for the purchase of the warehouse property. Parr called Cota's office at 10:00 or 10:30 a.m. and left the message, "Call me" or "I've got an offer, call me." Parr placed two or three other calls to Cota that day. A mid-afternoon message clearly stated that Parr had an offer on Mutual's warehouse.

Meanwhile, Cota and May were in meetings most of the day. Cota testified that he had met with May in the morning to discuss the warehouse sale. About noon, he said, they went into a meeting concerning Gilley's possible merger with another company. They remained in that meeting, according to Cota, until 3:00 p.m., when they went directly into the meeting in which Krigbaum accepted the Tall offer.

Cota testified that he had learned of the McKenzie offer at about 5:00 p.m., when he began returning calls that had been held for him during the meetings. He claimed that he typically arranged to have his calls held in such situations. Cota returned Parr's call at that time and learned that McKenzie was prepared to offer $1,265,000 for the warehouse, subject to certain contingencies. Cota told Parr that Mutual had reached an agreement with another party and that they were not taking any more earnest money agreements. According to Cota, the conversation occurred after Krigbaum had signed the Tall contract.

No sale was completed by Mutual's June 1 deadline. The Red Cross eventually exercised its right to purchase the warehouse and then resold it to McKenzie despite Tall's unsuccessful challenge to the validity of the Red Cross' right of first refusal in a suit for specific performance of his contract with Mutual.

Gilley brought this action against Mutual for its commission under the listing agreement. Mutual advanced several counterclaims and affirmative defenses. Some were struck prior to trial; most of the remaining allegations were struck before the case was submitted to the jury, which found in favor of Gilley.

Mutual raises 20 assignments of error on appeal which can be divided roughly into four categories: 1) those concerning Gilley's alleged failure to explain the contract of sale; 2) those concerning Gilley's alleged failure to inform Mutual of all available offers; 3) those concerning Gilley's alleged failure to disclose the property management agreement between Gilley and the buyer; and 4) those concerning the claim that Gilley represented conflicting interests.

## FAILURE TO EXPLAIN CONTRACT

Mutual alleged that Gilley breached its duty by failing to inform Mutual that the final Tall contract did not mention the Red Cross' first right of refusal and by failing to tell Mutual that it was required to pay all of the closing costs. The Supreme Court explained the real estate broker's duty to his client in *Prall v. Gooden,* 226 Or 554, 561, 360 P2d 759 (1961):

> "[A real estate broker] must * * * make a full, fair and understandable explanation to the client before having him sign any contracts, particularly when those contracts are with the broker himself."

Mutual also alleged that Gilley should have informed it that the right of first refusal was not mentioned in the contract and should have advised it to insist on including such language.[1] Mutual further alleged that its attorney had instructed Gilley to mention the first-refusal right in the purchase agreement. Finally, Mutual alleged that Gilley knew that Tall intended to try to avoid the first-refusal right and that Gilley therefore should have warned it of Tall's intent. Mutual assigns error to the trial court's striking these allegations.

---

[1] Presumably, Mutual's theory was that it was injured by the failure to include such language, because the suit brought by Tall contesting the validity of the refusal right delayed finalization of the sale, resulting in financial difficulties for Mutual.

Gilley makes two arguments in response to Mutual's assignments. First, it argues that by advising Mutual to include language concerning the first right of refusal, its agents would have been practicing law illegally. *See* ORS 9.160. Second, Gilley also argues that the failure of the document to mention the first right of refusal did not cause Mutual any loss. Gilley claims that the fact that Tall was not able to defeat the Red Cross' right shows that mention of the right was unnecessary.

■ We conclude that the trial court did not err in striking those allegations. We need not decide whether Gilley, in fact, had a duty to inform Mutual that the agreement did not mention the first-refusal right, because we conclude that the causal connection between the alleged breach and the injury ultimately suffered by Mutual is much too attenuated. Mutual's allegations rely upon the assumption that, if the refusal right had been mentioned: 1) Tall would still have signed the contract; 2) the Red Cross would have exercised the right; and, most importantly, 3) because the first right of refusal was specified in the contract, Tall would not have brought an action to contest the Red Cross' right to purchase the property. Because the causal connection between Gilley's alleged breach of duty and Tall's lawsuit is so speculative, we conclude that Mutual's allegations concerning Gilley's failure to inform it of the absence of first right of refusal language fails, as a matter of law, to state a claim for relief. It was not error to strike them.

■ For the same reasons that we conclude that the trial court was correct in striking the above allegations, we find no error in its decision to strike Mutual's allegations that Gilley negligently failed to carry out instructions from Mutual's attorneys to mention the first-refusal right in purchase documents[2] and that Gilley failed to warn Mutual that Tall intended to avoid the Red Cross' refusal right.

■ Mutual also alleged that Gilley breached its duty by not pointing out that the Tall purchase agreement required Mutual to pay all closing costs. The trial court

---

[2] Our determination also disposes of Mutual's assignments of error claiming that testimony concerning the instructions its attorneys supposedly gave to Gilley concerning mention of the first right should not have been excluded.

struck allegations to that effect prior to trial. Mutual claims that was error; Gilley does not respond on appeal. Evidence produced by Mutual at trial could have shown that it was not customary for one party to pay all of the closing costs in transactions of this kind and that Gilley knew that this was the case but failed to disclose it. Because facts could have been elicited to prove an actionable claim, we conclude that the trial court erred in striking the allegations.

## FAILURE TO INFORM OF AVAILABLE OFFERS

■ The trial court struck Mutual's allegations that Gilley failed to present all available offers to it and, in particular, that it did not inform Mutual of the McKenzie offer. Mutual argues that those allegations should have been considered by the jury. We agree.

Parr, McKenzie's agent, testified that he left several messages at Cota's office beginning in mid-morning on May 15 and continuing throughout the day. Parr stated that at least one message had clearly indicated that he had an offer on the. Mutual warehouse. Cota testified that he had not received Parr's message concerning the offer on the warehouse until after Krigbaum had signed the Tall contract.

Gilley argues, in support of striking the allegations, that Cota's testimony was uncontroverted and therefore established that Cota did not know of the McKenzie offer until after the Tall deal was closed. This ignores the significance of Parr's testimony. From his testimony that he had left several messages at Cota's office, and that at least one of those messages had clearly stated that Parr had an offer on the Mutual warehouse, the jury could reasonably have concluded that Cota received those messages before the Tall agreement was finalized. As Mutual points out, the jury was entitled to disbelieve Cota's testimony to the contrary. Failure to convey an offer would clearly constitute a breach of Gilley's fiduciary duty.

Gilley responds that, according to the testimony, Mutual would not have accepted the McKenzie offer even if it had known of it. It points out that the McKenzie offer had two important contingencies that "would have

precluded a firm deal at the time if the offer had been accepted." Gilley also refers to Krigbaum's testimony that he would not have signed the McKenzie offer in the form it was presented.

Krigbaum's testimony at trial concerning the McKenzie offer includes the following:

"Now, on May 15th, putting yourself back in — all the conditions that existed then and I think you have testified that Mr. Mitchell was fairly desperate for money and anxious to get this building sold, do you seriously contend that you would have signed this agreement?

"A. Mr. — no, I don't. Mr. Cota — Mr. Cota would have been able to qualify that agreement for that earnest money and the conditions. He was the broker.

"Q. So, you don't — you don't know what would have happened?

"A. No.

"Q. On this condition about information that they obtain financing satisfactory to the purchaser?

"A. But, those contingencies could have been cleared up by Mr. Cota.

"Q. Possibly?

"A. Possibly.

"Q. Possibly not?

"A. Possibly not. However, the —

"Q. So, at the time on May 15th —

"MR. BAKER: Excuse me, I don't think the witness had finished his answer.

"THE COURT: You can finish your answer if you have not.

"MR. CUTSFORTH: I thought he said possibly not.

"THE WITNESS: I said possibly not. However, they are the individuals that ended up with the building. So they would have met the conditions.

"Q. (By Mr. Cutsforth) Well, on May 15th, if you'd been given this alongside the Tall agreement, the Talls — it has no conditions on it, cash purchaser. This has a ten thousand dollar down payment. The Talls had a hundred thousand dollars down payment. I think you testified, did you not, that you needed a hundred thousand dollars down?

"A. That was right.

"Q. Is it your testimony now that you would have signed this and rejected the Tall —

"A. No, it is not my testimony that I would have signed that.

"Q. Okay. At any rate, the one was ready to be signed, wasn't it, the Tall?

"A. Yes, and so was B. P. S., the other offer that was there presented to me at the same time.

"Q. All right.

"A. I was there to review all offers that he had.

"Q. Okay. And, you elected to take the Tall and reject the B. P. S.?

"A. That's right.

"Q. If this offer had been there, wouldn't you have done the same thing?

"A. I probably would have or —

"Q. Okay.

"A. Pursued it."

Gilley's attorney then read into evidence a portion of Krigbaum's testimony in an earlier deposition. At that time, Krigbaum admitted that the down payment proposed in the McKenzie offer was not adequate, that it was not a "cash deal" and that it was contingent on obtaining financing satisfactory to the buyer. Gilley's attorney also read the following passages from the deposition:

"* * * * *

"Now skipping down a question: 'But, as a businessman, Mr. Krigbaum, looking at that so-called offer that you have in front of you there, that is no more than an offer to buy the building if I could find financing satisfactory to me.

"Answer: That's right, sir.

"Question: And, if you had been presented with that at the same time that you were presented with the Tall offer, what would your decision have been?

"Answer: My decision probably would have been to go with the Tall offer.

"Question: Because it was not conditioned on anything, was it?

"Answer: That's right.' "

Although Krigbaum's testimony was contradictory on this matter, the evidence does not establish as a matter of law that Krigbaum would have signed the Tall agreement even if the McKenzie offer had been presented to him. The jury could have decided the question either way.[3] The trial court erred in striking Mutual's allegations that Gilley failed to present all available offers to it.

Mutual next assigns error to the trial court's granting Gilley's motion for a directed verdict on Mutual's counterclaim alleging that Gilley was remiss in not getting a higher price. The counterclaim dealt specifically with the alleged failure to convey the McKenzie offer. In light of our holding that a jury question existed as to that allegation, we hold that the court erred in allowing the directed verdict on this counterclaim.

■ Mutual also argues that the court erred by refusing to allow its representative, Krigbaum, to testify whether he would have signed the Tall agreement if he had known about the McKenzie offer. In light of our holding that the evidence would have supported a conclusion that Gilley's Cota knew about the McKenzie offer before Krigbaum signed the Tall agreement, we conclude that exclusion of the testimony was error.[4]

■ Mutual also argues that the court should not have excluded testimony of Mr. Saito, the owner of McKenzie, as to whether he would have modified his offer to meet Mutual's requirements. Gilley objected on the ground that the testimony was irrelevant. We agree. If Gilley's Cota

---

[3] In its reply brief, Mutual argues that Gilley's knowledge may be predicated on the rule that notice to an agent or servant is notice to the principal if it concerns the business conducted through the agent or servant. Our disposition does not require us to consider that argument.

[4] Although the court excluded this testimony when Mutual's attorney sought to elicit it, Gilley's attorney cross-examined Krigbaum as to the identical matter. We have quoted that cross-examination in our discussion of the McKenzie offer. *See* 11-15, *infra*. The fact that the testimony was later elicited arguably moots this assignment of error. However, we note it in view of the fact that this case must be retried.

knew about the McKenzie offer before Mutual's Krigbaum signed the Tall agreement, any failure on his part to convey the offer to Krigbaum would be actionable, independently of the ultimate viability of the offer.

## FAILURE TO DISCLOSE
## COLLATERAL AGREEMENT

Mutual alleged that Gilley breached its duty by executing the property management agreement with Tall and by failing to disclose to Mutual that it was receiving consideration from Tall in the purchase from Mutual. The evidence was in conflict as to whether Krigbaum was informed of the property management agreement. In short, a jury question was raised by the testimony. If Gilley did, in fact, fail to disclose that it was profiting from Mutual's sale to Tall, its actions arguably would have constituted a breach of its duty to inform the client of facts material to the sale. *See Prall v. Goodon, supra; Gibson Bowles, Inc. v. Montgomery,* 51 Or App 313, 625 P2d 670 (1981), Gilley's particular interest in Mutual's sale of land *to Tall* is material, if for no other reason than that it calls Gilley's objectivity into question.[5]

Gilley claims that knowledge of the side agreement would not have prevented Krigbaum from signing the agreement. Krigbaum's testimony on that matter is inconsistent. Initially, he testified that, had he known of the side agreement, he would have consulted with his attorney before signing the Tall agreement. Later, Krigbaum stated that knowledge of the side agreement would not have detered him from signing the Tall agreement. The tenor of his testimony is that he was unsure whether knowledge of the side agreement would have affected his willingness to sign the Tall agreement. We think a jury question was presented. We cannot conclude that failure to disclose the agreement to Krigbaum was inconsequential as a matter of law. Failure to disclose the side agreement could give rise to a claim for breach of duty, and there was a jury question as to whether Gilley had disclosed the agreement to Mutual. The trial court therefore. erred in striking such allegations.

---

[5] The fact that Gilley did not wish to undertake the agreement would not affect a claim of breach. The important fact is that Gilley was to receive valuable, independent consideration from the agreement.

## REPRESENTATION OF INTERESTS ADVERSE TO MUTUAL

Mutual alleged that Gilley breached its duty by:

"[r]epresenting interests adverse to Mutual in the leasing and sale of Mutual's property in that it negotiated on behalf of Mutual's lessee, sought to promote interests of purchasers, Leonard H. Tall, and the American Red Cross, all when [Gilley] had conflicting duties to promote the best interests of Mutual."

Mutual also alleged a breach of duty by failing to disclose the nature of such representation. The court struck those allegations, and Mutual claims error.

■ Mutual does not provide argument pertaining to these assignments of error in its brief. We presume that the allegations refer to a statement in a fee addendum attached to the 1979 listing agreement between Mutual and Red Cross, which stated that "the Gilley Company represented both parties on this lease." The statement referred to the original lease between Red Cross and Mutual. However, the instant case is based entirely on the *sale* of Mutual's property. The earlier lease agreement is not at issue.[6] The trial court was justified in striking the allegations as to Gilley's representation of adverse interests. It was also justified in excluding testimony concerning that lease agreement.

Reversed and remanded for a new trial.[7]

---

[6] The lease agreement was attached to the 1979 listing agreement for sale of the warehouse, because Mutual still owed Gilley its commission for obtaining the lease and was to pay that commission from the proceeds of sale.

[7] Because of the disposition we make of this case, we need not consider Mutual's assignment of error claiming that the court should have granted its motion for mistrial.